In the Matter of the Arbitration between
GREAT CIRCLE LINES, LTD.,
Petitioner-Appellee,

v.

MATHESON & CO., LTD.,
Respondent-Appellant.

No. 733, Docket 81–7747.

United States Court of Appeals,
Second Circuit.

Argued Feb. 18, 1982.
Decided June 3, 1982.

Jack A. Greenbaum, Healy & Baillie, New York City, for petitioner-appellee.

Elbert W. Robinson, Jr., Kirlin, Campbell & Keating, New York City, for respondent-appellant.

Before MESKILL, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

The petitioner-appellee, Great Circle Lines, Ltd. (Great Circle), sought arbitration in New York against respondent-appellant Matheson & Co., Ltd. (Matheson). When Matheson failed to appoint an arbitrator, petitioner commenced the subject action pursuant to 28 U.S.C. § 1333(1) and 9 U.S.C. § 1. Matheson appeals from a decision following a bench trial before the United States District Court for the Southern District of New York, Constance Baker Motley, Judge, which held that negotiations between the parties regarding a time charter resulted in a binding contract and ordered respondent to proceed to arbitration under the provisions of 9 U.S.C. § 4.

The issue before us is whether, under maritime law, there existed a meeting of the minds between Matheson and Great Circle which satisfactorily served as the basis for a contract or "charter party." The district court found upon the facts before it that there was such a meeting of the minds. We agree.

## I.

The object of the charter party was the M/V CLUDEN, owned by the London-based Matheson, which Great Circle of New York sought to charter in October 1979 to transport bagged palletized clay to Japan. From the moment of the initial inquiry by Great Circle on Tuesday, October 23rd, there were only five days until Saturday, October 27th, the date on which Matheson had said its vessel would be ready for her next engagement. Involved in negotiations during this brief time span were nine individuals and business entities. The cast is set forth as an aid to understanding the negotiations that ensued.

(1) Great Circle—appellee-charterer, a company engaged in the transportation of dry cargoes;

(2) Matheson—a British corporation and appellant-owner of the M/V CLUDEN;

(3) James G. Evans—an in-house broker for Great Circle;

(4) Simpson, Spence & Young (Simpson, Spence)—an independent ship brokerage and chartering partnership with offices in London and New York;

(5) Harold Haugeto—an employee of Simpson, Spence in New York;

(6) David Stoop—an employee of Simpson, Spence in London;

(7) Howe, Robinson & Co., Ltd. (Howe, Robinson)—Matheson's broker in London;

(8) John Strong—a broker employed by Howe, Robinson;

(9) Ronald Cooke—an employee of Matheson, in charge of letting the CLUDEN out for charter.

Communications between charterer and owner travelled back and forth on the following channel:

| Evans ◄──► | Haugeto ◄──► | Stoop ◄──► | Strong ◄──► | Cooke |
|---|---|---|---|---|
| Great Circle | Simpson, Spence | Simpson, Spence | Howe, Robinson | Matheson |
| (NYC) | (NYC) | (London) | (London) | (London) |

The negotiations are recited chronologically from their inception to termination. Evans testified that on Tuesday, October 23, 1979, he was the chartering manager for Great Circle Lines, a subsidiary of Reefer Express Lines which was better known in the shipping industry than Great Circle. Reefer Express often guaranteed its subsidiary's charters and did so in this case. Evans was in charge of transportation of dry cargoes. His work involved finding cargoes and vessels and putting the two together as pieces of business. He made an offer, through Simpson, Spence at the ship broker's New York office, to the owners of the CLUDEN because he knew the ship would shortly be available. Matheson requested further information from Simpson, Spence since it had no previous contact with Great Circle.

Satisfied by the answer, Matheson made a counteroffer and serious negotiations began on Wednesday, October 24th. Matheson wanted to conclude negotiations as quickly as possible inasmuch as the CLUDEN was to be ready to take on a new assignment on Saturday, October 27th. The owner and charterer were conducting their communications through "end brokers," those the owner and charterer deal with directly as distinct from "intermediary brokers" who deal with the owner's or charterer's broker. The charterer's end broker was Simpson, Spence and the owner's was Howe, Robinson. On Wednesday Great Circle and Matheson, negotiating through their end brokers, agreed upon these terms: name of the charterer and its guarantor, a description of the CLUDEN'S characteristics, time and place of delivery, duration of the charter, place of redelivery, trading exclusions (certain cargoes were forbidden), commissions, and the printed form, NYPE46, upon which the details of the contract were to be based. In fact, after trading throughout the business hours of October 24th, only the hire rate remained to be agreed upon. As revealed by the exhibits, the owners originally asked $7,275 per day including overtime and were offered $6,950 by the charterer. The asking price was reduced to $7,200 with a comment from the London broker: "don't see a lot less in the rate from owners." Finally, after the close of business on October 24th, Simpson, Spence, having talked by telephone with Great Circle, telexed on behalf of the charterer: "accept owners last offer at $7,150 daily [including overtime]." Thus on Wednesday, October 24th, the parties having reached an agreement on the hire rate, all the "main" terms were complete. Later that evening Mr. Haugeto of Simpson, Spence in New York sent a telex to Mr. Stoop of Simpson, Spence in London so that each office would know what had been agreed upon up to that point in the event of Haugeto's or Stoop's unavailability. The telex included the phrase: "So we fixed sub [subject to] details." That same evening Matheson's Mr. Cooke wrote at the end of his notes regarding the negotiations: "$7,150 agreed sub dets [details]."

On Thursday, October 25th, Evans requested Haugeto to "telex fixture recap to [Great Circle]." A fixture recap is understood in the industry to be a recapitulation of the main terms that had been agreed upon in the negotiation of a charter party. Included in the telex sent to Evans, which set forth the terms agreed upon between charterer and owner as of October 24th, was the phrase "subject details NYP[E]46." NYPE46 refers to the New York Produce Exchange 1946 contract, the form upon which the details of the contract for the CLUDEN were to be based.

Also on Thursday, Matheson sent the following telex message, in conformity with the custom of the industry not to permit an on hire survey until a ship has been chartered: "Owners suggest if charterers require on hire survey, that it is undertaken at this shipyard on Saturday morning." That same day Great Circle sent a lengthy telex which suggested amendments to NYPE46. This telex proposed numerous changes to the form's 28 standard printed clauses and requested that 33 rider paragraphs be added. These amendments altered 108 lines of the form and filled seven pages of the record. Included in the telex were offers to renegotiate some of the main terms upon which the parties had agreed.

On Friday, October 26th, Matheson accepted some of charterer's suggested amendments to NYPE46, rejected others and proposed that London rather than New York be the arbitration site. It set a deadline for Great Circle to respond by 2:30 p. m. London time or 9:30 a. m. New York time. Mr. Evans testified that he received this message shortly after 9:30 a. m., i.e., after the deadline. His request for additional time to reply was unavailing. At 10:20 a. m. that same morning Matheson advised Great Circle that it was in default and shortly thereafter chartered the CLUDEN to a third party. Great Circle protested and demanded arbitration.[1] Upon Matheson's refusal, the instant action was commenced by the charterer which resulted in a holding by the lower court that there was a binding charter party between the parties.

Matheson appeals contending that the lower court erroneously adopted an analysis which segregated the "main" terms from the other contractual terms which it labelled "details." It also argues that the district court then found that there was agreement on the main terms without making any findings as to whether the details constituted essential terms of the charter party upon which agreement was not reached. Finally, the owner urges that in the exchange of telexes, the phrase "subject to details" created a condition subsequent which failed. None of these contentions are persuasive.

## II.

In order to determine whether a charter party existed we consider first its nature. A charter party is "a contract by which an entire ship or some principal part thereof is let to a merchant . . . ." E. Jhirad and A. Sann, 1 *Benedict on Admiralty* § 225 (7th ed. 1981) [Benedict]. The term "charter party" actually refers to the document in which the terms and conditions of the lease of a vessel by an owner to a charterer are set out. G. Gilmore & C. Black, *The Law of Admiralty* § 4–1 (2d ed. 1975).

■ As a maritime contract a charter party is governed by maritime law and thus "need not be in writing unless expressly so required by an applicable statute." Benedict, *supra*, § 225 at 14–24, 25. The binding effect of oral contracts in maritime law is an ancient concept whose roots are deeply embedded in custom, *Kossick v. United Fruit Co.*, 365 U.S. 731, 734, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961); binding chartering engagements have historically been assumed on nothing more formal than the nod of a head. At the same time a charter party is merely a contract, subject to all the rules and requirements of contract law. G. Gilmore & C. Black, *The Law of Admiralty* § 4–1 at 195 (2d ed. 1975). Under general contract law principles no contract exists where the parties fail to agree on all the essential terms or where some are too indefinite to be enforceable. *Interocean Shipping Co. v. National Shipping and Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972).

1. The NYPE46 form contains the following arbitration clause:

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.

Certain long-standing customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract. We recount those practices upon which a resolution of this case turns and which were, in substance, found to exist by the trial court based on its assessment of the credibility of the witnesses. The trial court's credibility findings, unless clearly erroneous, are binding upon us. Fed.R. Civ.P. 52(a).

The shipping industry is a fast moving and ever changing business, where dealings between the parties called "trade" are usually conducted with a sense of urgency under severe time constraints. To bring owners and charterers together, it is the custom of the industry to deal through brokers who receive and send telex traffic all over the world.

Charter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. These terms usually include the name of the charterer, name of owner, ship and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important. These are considered the "bare-bones" of the contract. The "main" terms when agreed upon are entitled a "fixture."[2] Second, after a "fixture" has been reached, the parties continue to negotiate "details" amending the form contract specified in the "fixture." These minor or side issues "flesh-out" the original agreement or fixture. The "details" include a wide variety of matters, for example: fuel used, speed of vessel, condition of ship's holds, exact time of ship's delivery to charterer, brokerage, breakdown, bunkering, option to extend charter, cargo capacity, demurrage and whatever else is deemed by the parties to be of minor importance. The details are not meaningful to the trade in the same way that the main terms of the fixture are, inasmuch as the fixture affects the trade directly and determines whether it will be a successful piece of business. Where no amendment of details is agreed upon, however, the terms of the printed form govern. Thus, the trial court's segregation of the main terms from the details was in accordance with the custom of the shipping industry.

### III.

We turn next to Matheson's contention that there was no agreement on the details which constituted an essential part of the charter party. Whether there was a meeting of the minds resulting in a charter party is a question of fact. *Interocean Shipping Co. v. National Shipping and Trading Corp.*, 523 F.2d 527 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). The correct standard of review of the facts found by the trial court is contained in Federal Rule of Civil Procedure 52(a), "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

In this case we find from our own review of the record ample evidence to support the findings of fact made by the district court. Pertinent proof to sustain the finding that a fixture was in place includes

---

**2.** Fixture was defined during the trial by expert witnesses as a commitment that a voyage will be performed. It presupposes a final contract, with main terms set, and final details to be resolved subsequently. It could be called a summation of all the necessary items consented to by owner and charterer in order to constitute agreement on the use of a ship. In one of the leading texts on admiralty law "fixture" of a ship is defined as the bringing to successful conclusion of the negotiations precedent to signing the charter. It is complicated work, performed by brokers with an elaborate communications network which enables them to bring together an owner of a ship and a charterer with cargo. G. Gilmore and C. Black, *The Law of Admiralty* § 4–1 at 197 (2d ed. 1975).

Haugeto's telex to Stoop on Wednesday October 24th ("So we fixed sub details"), the note made by Cooke of Matheson that same evening ("$7,150 agreed sub dets"), and the telex sent on Thursday the 25th by Matheson suggesting that the charterer conduct a survey of the CLUDEN, which the custom of the industry permits the charterer to make only after a ship has actually been chartered.

In light of these facts we can only conclude that the trial court correctly found a fixture establishing main terms, including adoption of NYPE46, and agreeing to negotiate over details. The fixture constituted a meeting of the minds sufficient to support the formation of a charter party. The trial court explicitly found in this connection that in agreeing to use this form the parties intended that its terms supply the details of the CLUDEN's charter, unless they subsequently agreed otherwise.

## IV.

The remaining issue is whether the "subject to details" language, variously phrased, created a condition subsequent. It is Matheson's view that the phrase was a condition subsequent which, upon its failure, terminated the existence of the contract already formed; i.e., the telex of the evening of the 24th ("So we fixed sub details") and Cooke's note to himself meant there was a contract, but if no agreement on details was reached all contractual duties were extinguished. This argument is not persuasive.

■ In order to determine whether the phrase in question created a condition subsequent, we begin by looking to the keystone of all contract law, which is, of course, the intent of the parties when viewed in a fair and reasonable manner under all the circumstances. The fixture agreed to by the parties contained its own contract-saving mechanism in the event there was a failure to agree on details—the NYPE46 form. Except for the owner's suggested change, that the arbitration site be London rather than New York City, which was never acted upon because of Matheson's imposition of a deadline, the arbitration clause remained intact. Since the intent of the parties is what must be divined in this contract dispute, we cannot imagine that the charterer and the owner, after making careful provision for the security of the fixture, intended that either party, simply by refusing to agree on minor details could thereby cause the fixture to self-destruct. The legal effect of adopting NYPE46 is inescapable—it provided the details for the charter, subject to change only by further negotiation.

The outcome of continuing negotiations over details is in no way a condition subsequent. One of the main terms of the fixture was adoption of NYPE46, a printed form containing a multitude of details, with arbitration as the mechanism stipulated by the parties for resolving differences as to the contract's meaning. If the continuing negotiations resulted in agreement over changes in NYPE46, the amendments would, of course, govern. If the negotiations failed, however, the terms of the printed form would continue in force. Thus, the outcome of continuing negotiations over details in no way affects the validity of the contract. In short, the phrase subject to details is not a condition subsequent which failed.

Finally, Matheson argues that owing to its London situs its understanding of the terminology in use in the industry was different than that found by the trial court. Any lingering concern that the London-based owner of the CLUDEN might honestly have understood the phrase used to have a different meaning is dispelled by a leading treatise in this field published in London. J. Bes, *Chartering and Shipping Terms* (9th ed. 1975). This text—considered a prominent international reference work on the shipping industry and one which has been translated into seven languages—reinforces the international scope of the industry's customs and usages. It discusses the function of the chartering brokers in much the same way as that found by the trial court, and defines a "Fixing Letter" (a condensed fixture) as a summary of the principal conditions of a charter par-

ty. *Id.* at 45. Under a listing of standard charter parties, it refers to the "time charter party approved by the New York Produce Exchange." *Id.* at 31–32. Hence, it may be surmised that the customs of this worldwide business were the same in London as in New York.

This appeal is not frivolous and provides no warrant for an award of attorneys' fees.

The order is affirmed.