**SAMSUN CORPORATION, as Owner of the Prabhu Daya, Petitioner,**

v.

**KHOZESTAN MASHINE KAR CO., as Charterer, Respondent.**

**No. 95 Civ. 3523 (CSH).**

United States District Court, S.D. New York.

May 29, 1996.

Healy & Baillie, New York City (Jeremy J.O. Harwood, Richard V. Singleton, II, of counsel), for Petitioner.

Hill Rivkins Loesberg O'Brien Mulroy & Hayden, New York City, (Caspar F. Ewig, Alan S. Loesberg, T.E. Willoughby, of counsel), for Respondent.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

This is a petition pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq,* to compel arbitration of commercial disputes in New York. The respondent opposes the petition on the ground that the parties did not agree to New York arbitration. Subject matter jurisdiction in this Court arises out of the underlying maritime contract of charter party.

### Background

Petitioner Samsun Corporation ("Samsun"), a Korean corporation, is the owner of the motor vessel PRABHU DAYA. Samsun alleges that on March 9, 1995, it entered into a voyage charter party with respondent Khozestan Mashine Kar Corporation ("KMK"), an Iranian corporation, for the carriage of a part cargo of steel plates from a port in Iran to Bangkok, Thailand. The voyage was performed. Samsun claims that KMK is indebted to it for demurrage and detention. KMK rejects those claims. Samsun says that KMK agreed in the charter party to arbitrate such disputes in New York before a three-arbitrator panel, one arbitrator to be appointed by each party and the third chosen by the two arbitrators thus appointed. KMK

says that it did not so agree. Samsun appointed its arbitrator and, upon refusal of KMK to follow suit, brought this petition to compel arbitration under 9 U.S.C. § 4. Where the making of an arbitration agreement is in issue, the Court resolves the matter. *Id.*

The parties have submitted a number of affidavits, more than one from certain individuals, and many exhibits. They differ with each other in certain areas. But the following facts are undisputed.

Following the custom of the industry, Samsun and KMK were represented by chartering brokers with authority to negotiate the terms and conditions of the charter party.[1] Samsun's broker was Nimble Shipping Division, a division of Nimble (UK) Ltd. of London, England ("Nimble"). KMK's broker was Seas Ark, S.A. of Tehran, Iran ("Seas Ark").

By fax dated March 4, 1995, KMK asked Seas Ark to attempt to charter a vessel to carry the steel shipment from Iran to Bangkok. Also on March 4, Seas Ark passed on that inquiry to Nimble, which on the same day telexed a proposal that the PRABHU DAYA be chartered for the voyage. Nimble's March 4 telex included a proposed freight rate and demurrage and despatch rates, and concluded: "after fixing main terms other Gencon." "Gencon" is the code name for a printed charter party form issued by the Baltic and White Sea Conference, a maritime trade association.

A series of faxes and telexes were then exchanged between the chartering brokers, containing counter-offers and responses to them. I need not describe them all in detail. It does bear noting, however, that in a telex Nimble sent to Seas Ark on March 5, agreeing on behalf of Samsun to certain main terms but refusing others, Nimble concluded by omitting any reference to the Gencon form, saying instead: "o/wise owns c/p details."

In fax and telex exchanges on March 6 and 7, the chartering brokers continued to negotiate on main charter party terms such as lighterage expenses, demurrage charges, laydays and cancelling date, and the freight rate. These negotiations resulted in agreement on March 9. In a telex during the morning of that day, Nimble "bid firm" to Seas Ark on certain open terms, and then said: "o/wise as previous." Seas Ark passed that telex on to KMK. In the afternoon of March 9, KMK telexed Seas Ark: "we hereby confirm yr freight rate and other conditions in yr am tlx," and added a request about the order of loading of the part cargo consigned to Bombay. Seas Ark at once passed on the text of KMK's telex to Nimble. Nimble telexed back to Seas Ark on March 9, recapitulating the main charter party terms agreed upon during the brokers' negotiations and adding: "o/wise as per owners c/p."

The PRABHU DAYA loaded the cargo covered by the charter party at the Iranian port of Bandar Iman Khomeini. According to the vessel's documents, laytime commenced on March 9, 1995. Loading was delayed because of intermittent unavailability of cargo. It began on March 11 and was completed on April 1. Samsun says that the vessel went on demurrage on March 12 and on detention on March 19. Thereafter the PRABHU DAYA performed the voyage called for by the charter party.

On March 17, 1995, Nimble faxed to Seas Ark a typed-up Gencon form charter party with additional typed clauses added by Samsun. Rider Clause 23 contains a provision for arbitration of disputes in New York. Seas Ark faxed a copy of the form to KMK on March 19. But on March 22, Nimble faxed Seas Ark an instruction not to pass on the typed-up charter to KMK for execution because Samsun had proposed some additional language relating to demurrage. On April 5, Nimble faxed to Seas Ark another typed-up charter party. The arbitration clause was not changed. Seas Ark faxed that charter to KMK on April 5. KMK has never signed the completed charter party.

On April 25, 1995, John Marshall, the individual at Nimble who had conducted the

---

**1.** *See Great Circle Lines, Ltd. v. Matheson & Co., Ltd.,* 681 F.2d 121, 125 (2d Cir.1982) ("Charter parties are formed in two stages. First, significant 'main' terms are negotiated through brokers.").

charter party negotiations on behalf of Samsun, received a request from KMK's London solicitors to come to their office to discuss the charter. That encounter promptly gave rise to an exchange of views between KMK's solicitors and Samsun's New York counsel. I need not recount the full particulars. Speaking through these legal advisers, Samsun took the position that KMK had agreed to arbitrate disputes in New York. Samsun appointed a New York commercial arbitrator and called upon KMK to do the same, consistent with the arbitration clause in the typed charter party Nimble first faxed to Seas Ark on March 17. KMK took the position that it had not agreed to New York arbitration, but that the charter party was subject to London arbitration. KMK appointed a London arbitrator and called upon Samsun to do the same, failing which, under the arbitration clause KMK relied upon, the arbitrator KMK appointed would act as sole arbitrator. Samsun commenced the proceedings in this Court by Order to Show Cause. KMK has agreed not to press for London arbitration until the petition at bar has been decided.

### Discussion

■ Arbitration is a matter of contract. *Haviland v. Goldman, Sachs & Co.*, 947 F.2d 601, 604–05 (2d Cir.1991), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992). A party cannot be compelled to submit to arbitration if it has not agreed to do so. *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Samsun, alleging an agreement by KMK to New York arbitration, bears the burden of proof on the issue. *Fisser v. International Bank*, 175 F.Supp. 305, 307 (S.D.N.Y.1958).

■ In determining whether the parties' minds met with respect to an arbitration clause, a court applies the ordinary principles of contract construction. *McAllister Brothers, Inc. v. A & S Transport Co.*, 621 F.2d 519, 524 (2d Cir.1980). However, where as here the contract is one of charter party, established practices and customs of the shipping industry inform the court's analysis of what the parties agreed to.

■ The custom pertinent to this case is that of "fixing 'sub details'." Translated into a landsman's language, the phrase means entering into a binding charter of a vessel ("fixing"), subject to details which, while to be agreed to later, do not prevent the prior creation of a binding contract. "Sub details" means "filling in the blanks—not reviewing the whole negotiations again." *Interocean Shipping Co. v. National Shipping and Trading Corp.*, 523 F.2d 527, 535 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

Wilford, Coghlin, Kimball, *Time Charters* (3d ed. 1989), describes the practice at page 30:

> The widespread practice of fixing 'sub details' ordinarily will not be construed as requiring agreement on each and every charter term before a binding contract is created. Once there has been agreement on essential terms, a contract is deemed to exist and the negotiation of remaining details becomes a ministerial task.

The Second Circuit had occasion to summarize this industry custom in *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 125 (2d Cir.1982) (footnote omitted):

> Charter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. These terms usually include the name of the charterer, name of owner, ship and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important. These are considered the "bare-bones" of the contract. The "main" terms when agreed upon are entitled a "fixture." Second, after a "fixture" has been reached, the parties continue to negotiate "details" amending the form contract specified in the "fixture". These minor or side issues "flesh-out" the original agreement or fixture. The "details" include a wide variety of matters, for example: fuel used, speed of vessel, condition of ship's holds, exact time of ship's delivery to charterer, brokerage, breakdown, bunkering, option to extend charter, cargo capacity, demurrage

and whatever else is deemed by the parties to be of minor importance. The details are not meaningful to the trade in the same way that the main terms of the fixture are, inasmuch as the fixture affects the trade directly and determines whether it will be a successful piece of business. Where no amendment of details is agreed upon, however, the terms of the printed form govern. Thus, the trial court's segregation of the main terms from the details was in accordance with the custom of the shipping industry.

The case for Samsun is that Nimble's March 9, 1995 telex to Seas Ark constituted a fixture recapitulation or confirmation, setting forth the agreed-upon "main" terms of the charter party. Nimble concluded that telex with the phrase "o/wise as per owners c/p," a phrase that, as noted, had appeared in earlier telexes during the negotiating process. This phrase, Samsun contends, means that the "details" of the charter party with KMK would follow the form charter party that "owners" (that is, Samsun as vessel owner) selected. And the New York arbitration clause, Samsun's argument concludes, was one of those details.

KMK responds with a number of contentions, not all of them consistent with each other. Through declarations of Seyed Mohammah Jafar Mohaghghpoor, KMK's employee in charge of the fixture, and through counsel, KMK makes the following points: KMK never signed the typed charter party. KMK's employees never saw the Samsun typed charter party; or, if they did see a Samsun form, it was a different form, providing for arbitration in London. Mohaghghpoor was inexperienced in the fixing of charter parties. KMK's chartering broker, Seas Ark, did not give KMK proper advice during the negotiations, and may even have been acting in collusion with Nimble.

■ The fact that KMK never signed the charter party is of no moment. Under the maritime law as applied in American courts, contracts of charter party need not be in writing; "binding chartering engagements have historically been assumed on nothing more formal than the nod of a head." *Great Circle Lines v. Matheson & Co.*, 681 F.2d at 124. Even so, a charter party "is merely a contract, subject to all the rules and requirements of contract law," and "[u]nder general contract law principles no contract exists where the parties fail to agree on all the essential terms or where some are too indefinite to be enforceable." *Id.*

Similarly, Mohaghghpoor's professed inexperience in ship chartering is of no moment. If the rankest amateur decides to participate in an established commercial industry, he is as bound by the customs and practices of that industry as the most grizzled veteran.

KMK's other contentions give rise to various disputed issues of fact. But I need not explore them further, because on the undisputed facts I conclude as a matter of law that Samsun's contention that KMK is bound to New York arbitration is based on a flawed basic premise.

■ The basic premise of Samsun's argument is that the phrase "o/wise as per owners c/p" in the fixture telex bound KMK to accept whatever arbitration agreement Samsun saw fit to include in the typed charter party eventually sent to KMK. I think that as the vehicle for a binding agreement to arbitrate, this phrase is too indefinite to be enforceable.

It is common ground that KMK had no notice of Samsun's charter party form containing a New York arbitration clause until Nimble faxed a copy of the form to Seas Ark on March 17. KMK had no prior experience with a Samsun form containing a New York arbitration clause. There is evidence in the record that with respect to two other voyage charters covering cargoes loaded in Iran in 1995, Samsun included a London arbitration clause in one of them, and a New York arbitration clause in the other. The parties dispute whether KMK had knowledge of those forms at the time of the fixture in suit. I think that it makes no difference. The pertinent fact is that Samsun, in drafting riders to the Gencon form, could choose between London and New York, two leading centers of commercial maritime arbitration, and in fact did so, selecting New York on one recent fixture and London on the other. The March 9 fixture telex from Nimble to Sea

Ark did not give KMK a clue as to the provisions of the arbitration clause, if any, that Samsun would subsequently insert in the charter party. The venue of arbitration was of foreseeable interest to KMK which, given the present political climate, expresses an understandable preference not to arbitrate disputes in the United States.

The cases cited by Samsun to bind KMK to New York arbitration under the "sub details" rubric all differ from the case at bar in that the exchange of telexes resulting in a fixture specifically identified the charter party form or arbitration clause which became a part of the contract. That is true of *Great Circle Lines, Ltd. v. Matheson & Co., Ltd., supra,* upon which Samsun places primary reliance. The telexed fixture recapitulation in that case contained the phrase "subject details NYP[E]46." 681 F.2d at 123. That was a reference to the New York Produce Exchange 1946 charter party form, a well-known industry document. In that circumstance, the Second Circuit said that "[t]he legal effect of adopting NYPE46 is inescapable—it provided the details· for the charter, subject to change only by further negotiation." That was sufficient to bind the parties to arbitration in New York, as provided in the New York Produce Exchange form because, as the court of appeals observed: "One of the main terms of the fixture was adoption of NYPE46; a printed form containing a multitude of details, with arbitration as the mechanism stipulated by the parties for resolving differences as to the contract's meaning." *Id.* at 126.

In *Interocean Shipping Company v. National Shipping & Trading Corporation,* 523 F.2d 527 (2d Cir.1975), the telexes resulting in a fixture provided that "the Mobiltime form charter 'sub details' would be used excluding certain clauses." 523 F.2d at 531 (footnote omitted). The Mobiltime form referred to contained an arbitration clause which the court held bound the parties.

In *Keystone Shipping Co. v. Compagnie Marocaine de Navigation,* 1990 WL 104029, 1990 A.M.C. 2971 (S.D.N.Y.), the fixture telex, after setting forth the essential terms of

the voyage, provided that the voyage be governed "per terms and conditions of the North American Grain charter part (pro forma 1982)." In his order compelling arbitration Judge Leisure reasoned: "In essence, the fixture is an embodiment of the Norgrain form. As this form has been in existence since 1982, the Court must conclude that Comanav was aware or should have been aware of the arbitration provision contained therein." 1990 WL 104029 at *4.

In *Maritime Ventures International, Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F.Supp. 1340, 1345–46 (S.D.N.Y.1988), the broker's telexes contained a specific reference to arbitration in New York.

In *Pollux Marine Agencies, Inc. v. Louis Dreyfus Corp.,* 455 F.Supp. 211, 213–14 (S.D.N.Y.1978), the fixture telex said: "We confirm having fixed the foil with you today subject details of Eldece Time." One of the pro forma details of the Eldece time charter was a New York arbitration clause, to which the parties were held.

These cases stand for the proposition that a reference in the fixture telexes to arbitration in New York, or at the very least a reference to a familiar charter party form which provides for arbitration in New York, binds the parties to arbitrate any disputes in New York, even though the formal charter party is not executed until later (or not at all). It is possible to say, in each of these cases, that before the brokers' communications gave rise to a binding contract, the party resisting arbitration was placed on notice, one way or the other, that disputes would be arbitrated. I read these cases as requiring such notice before a party can fairly be regarded as having agreed to New York arbitration. If I am correct in that, then Samsun cannot show an agreement by KMK to New York arbitration.

Samsun cites no case, and I have found none, holding that a reference in a fixture telex to "otherwise as per owners' charter party"[2] is sufficiently precise to give a charterer notice of, and accordingly bind it to, whatever arbitration clause the ship owner

---

**2.** I have translated the abbreviations in the fixture telex.

may subsequently insert in the typed charter party.

No court has apparently held that this phrase cannot have that effect. This may be a case of first impression. However, the rule is clear enough that a party cannot be compelled to arbitrate at a particular place and in a particular fashion unless it has agreed to do so; and I do not think that the phrase in the fixture telex upon which Samsun relies is sufficient for the purpose.

Samsun argues in the alternative that KMK is estopped from denying the existence of a New York arbitration clause. Primary reliance is placed upon *Arbitration Between Halcoussis Shipping Ltd. and Gonzalez Corp.,* 1977 A.M.C. 1658 (S.D.N.Y.1977) (not officially reported), which Samsun says arose "in not unsimilar circumstances." Supplemental Reply Brief at 11. In fact, the circumstances are materially dissimilar.

The vessel in *Halcoussis* was fixed to carry a part cargo of liquid tallow from New Orleans to Algiers. Carriage of such cargoes are customarily covered by the VEGOIL pro forma charter party form, which contains a New York arbitration clause. A claim for demurrage having arisen, the shipowner petitioned to compel the charterer to arbitrate. Judge Motley found that following the custom of the ship brokerage business, the negotiations between the brokers were oral, "and were predicated upon a pro forma charter party—in this case a VEGOIL pro forma." 1977 A.M.C. at 1600. A broker's notes of the conversations "indicated that a VEGOIL pro forma would be the basis for the charter agreement." *Id.*

By inadvertence, the charterer's broker, in advising charterer of the fixture by telex dated May 21, 1976, did not include in the fixture terms a reference to the VEGOIL pro forma charter party. However, when on June 2, 1976 charterer's broker received from owner's broker an appropriately altered VEGOIL pro forma charter party for execution by the parties, charterer's broker passed that contract on to charterer on the same day. The charterer made no objection to its terms and conditions before the vessel arrived at the loading port of New Orleans on

June 9, 1976 and began her performance under the charter.

In compelling the charterer to arbitrate, the first point of decision in Judge Motley's opinion focused upon the oral negotiations between the brokers. She wrote:

In the tallow trade, some form of VEGOIL pro forma form is usually employed. The oral agreement reached between brokers in the trade constitutes a binding agreement with the writing subsequently exchanged acting as confirmations. The oral agreement is understood to incorporate the terms of a form charter party, and both Peralta and Halcoussis' broker operated under this assumption in this case.

1977 A.M.C. at 1663.

The court also found it significant that the charterer made no objection "to use of the VEGOIL form and inclusion of the arbitration clause until well after the demurrage dispute arose" at the discharge port in Algiers. *Id.* 1664. This is the language upon which Samsun relies. But it appears in the context of the case where a particular charter party form was agreed upon by the brokers during their negotiations as the point of reference. Furthermore, the evidence showed that only two months before, the charterer, contracting to ship tallow from New Orleans to Algiers, signed a VEGOIL pro forma containing the same arbitration clause. *Id.* at 1659. The charterer thus had specific knowledge of the form which the brokers agreed would control the charter party in suit.

The facts in the case at bar are quite different. As noted, neither the brokers' negotiations nor the fixture telex contained any reference to a well-known and familiar pro forma charter party. In that regard, *Halcoussis* differs from the instant case as do the cases discussed *supra.* As for the estoppel point, the charterer in *Halcoussis* had the charter party containing the arbitration clause in hand a week before the vessel arrived at the loading port. In the case at bar, Nimble faxed to Seas Ark a completed charter party on March 17, 1995, eight days after lay time commenced and six days after loading began. But Nimble then instructed KMK through Seas Ark not to sign that

charter party, and did not send the revised contract until April 5, by which time for all that appears the vessel had sailed from the loading port. These facts are materially different from those in *Halcoussis*. They do not entitle Samsun to invoke the equitable doctrine of estoppel.

Because I conclude that Samsun has not and cannot prove that KMK agreed to arbitrate these charter party disputes in New York, I deny Samsun's petition to compel arbitration.

By that holding, I exhaust my limited jurisdiction under the Federal Arbitration Act, and make no other order in the case.

The Clerk of the Court is directed to dismiss the petition with prejudice.