**U.S. TITAN, INC., Petitioner,**

v.

**GUANGZHOU ZHEN HUA SHIPPING CO., LTD., Respondent.**

**No. 96 CIV. 0936 WCC.**

United States District Court,
S.D. New York.

Aug. 5, 1998.

As Amended Sept. 25, 1998.

---

Piper & Marbury, L.L.P., for Petitioner,
New York, NY, Leo G. Kailas, Carol M.
Fischer, of counsel.

Burlingham Underwood LLP, for Respondent, New York, NY, Michael Marks Cohen, Lizabeth L. Burrell, of counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This case is currently before the Court on petitioner U.S. Titan, Inc.'s ("Titan") motion for a summary determination of the making of a binding charter party agreement between Titan and respondent Guangzhou Zhen Hua Shipping Co., Ltd. ("Guangzhou"), and to compel arbitration on Titan's claim for breach of contract, pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 4. Guangzhou has cross-moved to dismiss the action for lack of jurisdiction and improper venue under Fed.R.Civ.P. 12(b)(1), 12(b)(2) and 12(b)(3), or alternatively, to stay the proceedings pursuant to 9 U.S.C. § 3 and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 et seq. (the "Convention").

For the reasons discussed below, the Court finds that the parties have entered into a binding charter party agreement that requires arbitration of their dispute; grants petitioner's motion to compel arbitration; and denies respondent's cross-motion to dismiss or stay the action.[1]

### BACKGROUND

The facts, according to petitioner, are as follows. Titan is a corporation organized under the laws of Texas, with its principal place of business in Pelham, New York. Guangzhou is a state-owned corporation organized under the law of the People's Republic of China, with its principal place of business in Canton, China. At all pertinent times, Guangzhou owned and operated the M/T BIN HE (the "BIN HE"), an ocean-going Chinese-flag tanker.[2]

On or about August 22, 1995, the parties began negotiating a time charter[3] of the BIN HE, through their respective brokers— Seagos Company, Inc. ("Seagos") of Stamford, Connecticut, on behalf of Guangzhou, and Seabrokers, Inc. ("Seabrokers"), also of Stamford, on behalf of Titan. The charter contained three "subjects," or conditions: (1) Titan's satisfactory inspection of the BIN HE; (2) the release of the vessel from its previous charterer, "Camaro"; and (3) the approval of the charter party by Titan's board of directors within three days of the board's receipt of the final inspection report.[4] (See Pet'r Exh. 29.) On September 22, 1995, Guangzhou offered to charter the BIN HE to Titan for 12 months at $15,250 per day, with an option for an additional twelve months at $15,750 per day. During the next few days, the parties negotiated different periods and rates, as well as several other terms. Ultimately, on September 26, Guangzhou re-

---

1. The Court will "stay" the action to the extent that it orders arbitration in London concerning Guangzhou's alleged breach of the charter party. See 9 U.S.C. § 3. It does not, however, stay the action with respect to the summary determination of a charter party.

2. Guangzhou claims that it did not own the BIN HE and merely chartered it from Zhu Hai Shipping Enterprise Ltd., its true owner. (Chen Reply Aff. ¶ 9.) Whether Guangzhou was BIN HE's owner, however, has little if anything to do with its obligations under the alleged charter party. To the extent that ownership of the BIN HE may be relevant, it can be determined by the arbitrator, who, as we conclude, must decide all disputes arising under the charter party. See Dover S.S. Co. v. Summit Indus. Corp., 148 F.Supp. 206, 209 (S.D.N.Y.1957); see also Tarstar Shipping Co. v. Century Shipline, Ltd., 451 F.Supp. 317, 321–22 (S.D.N.Y.1978) (charter existed between parties that negotiated agreement, even though "owner's name ... was not mentioned when the

vessel was fixed and confirmed by telex"), aff'd, 597 F.2d 837 (2d Cir.1979).

3. A charter party is "a contract by which an entire ship or some principal part thereof is let to a merchant ...." Jhirad & Sann, 1 Benedict on Admiralty § 225 (7th ed.1981). In a charter party, the terms and conditions of the lease of a vessel by an owner to a charterer are set out. Gilmore & Black, The Law of Admiralty § 4–1 (2d ed.1975). With a time charter, "the owner[] ... continues to navigate and manage the vessel, but her carrying capacity is taken by the charterer for a fixed time for the carriage of goods anywhere in the world (or anywhere within stipulated geographic limits) on as many voyages as approximately fit into the charter period." Id.

4. Respondent, on the other hand, takes the view that the board was to approve the proposed charter party within three days of the actual inspection of the BIN HE.

sponded with a "firm counter offer" as follows:

"... Accept/Except:

Period—6 mos. plus/minus 30 days at CHOPT

 CHOPT next 12 mos....

Rates—$15,250 first period

 Optional $15,750 second period."

(Pet'r Exh. 18.)

That same day, Titan informed Seabrokers that "Charterers are in agreement and accept Owner[']s last offer." (Pet'r Exh. 19.) Seabrokers then sent Seagos a fixture telex "recap[ping] Owners and Charterers' agreement." (Pet'r Exh. 1.) The agreement was based on the "Shelltime 4 Time Charter," a standard time charter, and contained the above subjects. (Id.) The Shell Time 4 Charter contained an arbitration clause, providing for arbitration in London, at the election of either party. (See Pet'r Exh. 4.)

Thereafter, the BIN HE was dry-docked in Hong Kong and inspected by Denholm Ship Management (Overseas) Ltd. ("Denholm"). On October 19, Titan received Denholm's initial report. (Warfield Aff. ¶ 16.) On October 23, Titan informed Seabrokers that it had concerns about the seaworthiness of the BIN HE, but that it was awaiting Denholm's final inspection report. (Id. ¶ 18 & Exh. 30.) Then, on October 25, Titan informed Seabrokers that it had received the full Denholm report and that it had "lift[ed its] inspection subject." (Pet'r Exh. 34.) It also stated that Titan "now look[ed] to [the] Owners to lift their Camaro withdrawal subject .... [and that] the Titan board will make its decision within ... three working days after the lifting of this subject per [the] 9/26 agreement." (Id.) On October 26, 1995, Seabrokers informed Titan that the BIN HE had been withdrawn from Camaro. (See Pet'r Exh. 20.) Titan thereupon replied that it would respond with board approval "by close of New York [business] Monday Oct. 30." On October 27, 1995, Titan notified

Seabrokers that its board had approved the charter. (Pet'r Exh. 21.)

Guangzhou presents a slightly different version of events. According to Guangzhou, Titan rejected the BIN HE by its October 23 telex, which informed Seabrokers that the vessels' machinery spaces were "in terrible condition," and that the vessel was not "up to an acceptable trading standard." (Chen Aff. ¶ 10 & Exh. 5.) Seagos informed Seabrokers that in view of Titan's rejection of the vessel, the conditions to which the charter had been subject had failed to occur. (Id. ¶ 10 & Exh. 6.)

Additionally, Guangzhou maintains that on October 24, Seabrokers confirmed that Titan had rejected the vessel, and that the subjects had therefore failed. (Id. ¶ 11 & Exh. 7.) Moreover, according to Guangzhou, on October 25, "Titan reversed its position and attempted to assert that the vessel had not failed the inspection." Guangzhou claims that it then terminated all negotiations with Titan. (Id. ¶ 13 & Exh. 9.)

On November 1, in a facsimile to Titan, Seagos suggested arbitration to resolve the dispute. (See id. ¶¶ 16–17 & Exh. 12.) Later that day, Titan proposed that the parties submit the matter "to three arbitrators in New York who would have 45 days ... to issue a ruling on the threshold issue of whether the parties entered into a binding agreement on September 26 subject to conditions that were subsequently fulfilled." (Pet'r Exh. 39.) On November 2, Seagos responded that the "Shell Time 4 Camaro proforma is very clear on the simplified arbitration which has been agreed by U.S. Titan and is agreeable to Southern Shipping as well. There is no need for a separate arbitration agreement at al[l]." (Pet'r Exh. 40.)[5] Titan then sent "formal written notice of Arbitration" to Seagos, advising it that arbitration was to follow "the Shell Time 4 clause 41(c) of Camaro/Titan Charter Party." (Pet'r Exh. 41.) On November 7, Titan sent a follow-up fax to Seagos, requesting confirmation that arbitration would be held under

---

5. Titan claims that Seabrokers did not understand the reference to "Southern Shipping," and to have believed that the reference to "Shell Time 4 Camaro" referred to the charter between Guangzhou and Camaro, which, in part, was to be assumed by Titan. Guangzhou explains that the reference to Southern Shipping was a typographical error, due to the fact that Seagos also represents Southern Shipping in brokering charterers. (See Chen Reply Aff. ¶ 8.)

clause 41(c) of the charter party. (Pet'r Exh. 42.) Seagos replied, "London arbitration in accordance with Clause 41(c) of the Shell Time 4 Camaro." (Pet'r Exh. 43.) On November 9, Titan once again faxed Seagos, asking for confirmation that "arbitration proceedings in London are to [be] . . . in accordance with Clause 41(c) of the Shell Time 4 Guangzhou/Titan Proforma, which is based on the 'Camaro' Charter." (Pet'r Exh. 44.) Seagos replied that "both sides" had agreed to London arbitration "to ascertain whether there is a charter between Guangzhou . . . and . . . Titan." (Pet'r Exh. 45.) Titan then sent another fax to Seagos, stating that "arbitration in London is acceptable per the agreement." (Pet'r Exh. 46.)

Following these exchanges, the parties attempted to select a London arbitrator. In one such communication, sent directly from Guangzhou to Seabrokers, Guangzhou reiterated that it had agreed to submit the matter to arbitration "pursuant to the Shell Time 4 Clause 41." (Resp.Exh. 18.) No agreement was reached as to the identity of the arbitrators.

On February 7, 1996, Titan again wrote to Seagos. Among other things, the fax stated that Titan would *"not* agree to arbitration outside of the binding Titan/Guangzhou charter." (Pet'r Exh. 47 (emphasis in original).) Seagos did not reply. Instead, Titan received a fax from Guangzhou, which stated that Titan was "not allowed to be in breach of the ad hoc arbitration clause which is actually running." The fax also referred to an "alleged C/P." (Resp.Exh. 20.) Titan responded that since the parties could not agree on whether a valid charter party existed, it was "free to initiate this issue here [in New York]." (Piskora Aff. ¶ 12.)

**6.** Thus, the standard for deciding a motion to dismiss for lack of subject matter jurisdiction is akin to that for summary judgment under Rule 56(e). Rule 56(e) provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters sated therein . . . . The Court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

## DISCUSSION

Titan now petitions this Court pursuant to section 4 of the FAA (1) to determine summarily that there exists a binding charter between the parties and (2) to compel arbitration for breach of that agreement. For the reasons discussed below, the Court declines to dismiss the case for lack of jurisdiction or for improper venue, and holds that the parties have entered into a binding charter. Furthermore, the Court will compel arbitration in London to enforce the agreement.

### I. *Relevant Legal Standards*

#### A. *Motion to Dismiss Under Rules 12(b)(1), 12(b)(3)*

■ On a motion to dismiss for lack of subject matter jurisdiction, the Court must accept all factual allegations in the Complaint as true and "refrain from drawing inferences in favor of the party contesting jurisdiction." *Serrano v. 900 5th Ave. Corp.,* 4 F.Supp.2d 315, 316 (S.D.N.Y.1998) (citing *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992)). The Court is not confined to the Complaint, however. It may consider "evidence outside the pleadings, such as affidavits." *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *accord Kamen v. AT & T,* 791 F.2d 1006, 1011 (2d Cir.1986).[6] Likewise, the Court may consider affidavits in deciding a Rule 12(b)(3) motion for improper venue. *See ESI, Inc. v. Coastal Power Prod. Co.,* 995 F.Supp. 419, 422 (S.D.N.Y.1998).

#### B. *Motion to Dismiss Under Rule 12(b)(2)*

■ In determining a motion to dismiss for lack of personal jurisdiction, the Court

When a motion [ ] is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. . . .

Rule 56(e) requires that the non-moving party oppose the motion with any of the evidentiary materials listed in Rule 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

also looks beyond the pleadings to affidavits submitted by the parties, considers the evidence in the light most favorable to the plaintiff, and resolves all doubts in its favor. *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). Prior to discovery, "the [plaintiff] need persuade the Court only that its factual allegations constitute a prima facie showing of jurisdiction." *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990).

## II. *Jurisdiction*

Titan claims that there exists subject matter jurisdiction under § 9 of the FAA. Guangzhou, on the other hand, argues that it is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"). The Court concludes that it has subject matter jurisdiction under 28 U.S.C. § 1330(a), because Guangzhou waived its immunity under the FSIA.

### A. *Subject Matter Jurisdiction Under the FSIA*

■ The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. A defendant corporation that is owned entirely by a foreign state is also immune from the jurisdiction of the Court. *See id.* §§ 1603(a), 1603(b)(2), 1604. If the immunity provisions of the FSIA are applicable, the Court is divested of subject matter jurisdiction over an action. *NYSA–ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35, 38 (2d Cir. 1993).

■ It is undisputed that defendant Guangzhou is wholly owned by the People's Republic of China. Therefore, in order for the Court to have jurisdiction over Titan's motion, there must be an applicable exception to foreign sovereign immunity under the

FSIA. *See Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 498, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The burden is on Titan "to go forward with evidence showing that, under the exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir.1993) (internal citations omitted). If an exception applies, the Court has subject matter jurisdiction over Guangzhou under 28 U.S.C. § 1330.

### 1. *Arbitration Exception*

■ The Court holds that Guangzhou has waived its immunity under § 1605(a)(6)(B) of the FSIA.[7] Section 1605(a)(6)(B) provides an exception to immunity in cases where a foreign state or sovereign entity has agreed to arbitrate a dispute and the arbitration agreement is or may be governed by a treaty signed by the United States calling for the recognition and enforcement of arbitral awards, such as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. "An arbitration agreement ... arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202. Congress has authorized the district courts to compel arbitration under the Convention in accordance with the agreement, including arbitration at sites outside the U.S. *Id.* § 203.

Here, Titan alleges that it entered into a charter party with Guangzhou that provided for arbitration in London, which is enforceable under the Convention. Guangzhou contends that the charter party was never formed, because Titan never completed the subjects precedent to the agreement. The U.S. and China are both parties to the Convention.

---

7. Although Titan has not raised § 1605(a)(6)(B) as a basis for subject matter jurisdiction, the Court may consider it sua sponte. *See American Centennial Ins. Co. v. Seguros La Republica, S.A.,* No. 91 Civ. 1235, 1996 WL 304436, at *15 n.23 (S.D.N.Y. June 5, 1996); *Gabay v. Mostazafan Found. of Iran,* 151 F.R.D. 250, 255 n. 8 (S.D.N.Y.1993) (citing *Verlinden,* 461 U.S. at 493 n. 20, 103 S.Ct. 1962).

*Cargill International S.A. v. M/T Pavel Dybenko* is on point. In *Cargill*, the Second Circuit Court of Appeals considered whether a district court had subject matter jurisdiction to determine whether a charter party, which contained an arbitration clause, applied in a particular case between a sovereign-owned company and a plaintiff that was a third party to the charter. The Court held that the district court had "jurisdiction to determine jurisdiction," and directed the court to consider "whatever evidence has been submitted" by the parties. 991 F.2d at 1019 (citations omitted). The Court reasoned that regardless of whether there existed an agreement to arbitrate that could be enforced by the plaintiff—the alleged beneficiary of the agreement—the Court had jurisdiction to determine whether "the arbitration agreement in the Charter Party was intended to benefit [the plaintiff]." *Id.* Of particular importance to the Court was that "the Convention should be broadly interpreted," "when ... read together with the FSIA[ ]." *Id.* at 1018. It is significant that Cargill was not seeking to enforce an arbitral award, but to determine whether it was a beneficiary of the contract and to enforce the arbitration agreement. *Compare id.* at 1017–18 *with Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 577–79 (2d Cir.1993) (enforcing arbitration award while distinguishing cases where plaintiff sought to have award enforced from cases in which there had been no award).

*Cargill* is applicable here, where the parties have allegedly entered into an agreement to arbitrate which is governed by the Convention and which is enforceable by the Court. *See* 991 F.2d at 1020 ("if [the plaintiff] is found to be a third party beneficiary to the Charter Party, it may be proper for the district court to enforce the arbitration agreement against [the defendant]"); *see also* 9 U.S.C. § 206 (allowing court to order arbitration under the FAA). According to *Cargill*, the FSIA must be read with the FAA to give the Convention a broad interpretation. Accordingly, the Court concludes that it has subject matter jurisdiction to determine whether the parties entered into a binding charter party agreement that required arbitration in London.

### 2. *Commercial Activities Exception*

■ Alternatively, the Court has subject matter jurisdiction over the action pursuant to § 1605(a)(2) of the FSIA, which provides, in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the Unites states in any case ... in which the action is based ... upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The Court concludes that Guangzhou's actions, taken in China, caused a "direct effect" in the U.S. and that those of its broker, Seagos, were taken "in connection with a commercial activity" of Guangzhou in China.

■ In order for an act taken "in connection with a commercial activity" to provide an exception to foreign sovereign immunity, it must be a "legally significant act." *See Hanil Bank v. Pt. Bank Negara Indonesia*, 148 F.3d 127, 133 (2d Cir.1998); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir.1993); *WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F.Supp. 734, 741 (S.D.N.Y.1997). "[A]n effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir.1991)).

Here, Guangzhou negotiated a contract with Titan, a U.S. corporation, by faxes sent to Titan and both parties' brokers in the U.S. The act of making and directing this correspondence was "an act [taken] outside the ... United States," "in connection with a commercial activity ... elsewhere," that caused Titan allegedly to suffer a "direct effect"—$1 million in damages—in the U.S. *See Caribbean Trading & Fidelity Corp. v.*

*Nigerian Nat'l Petroleum Co.*, No. 90 Civ. 4169, 1993 WL 541236, at *8 (S.D.N.Y.1993).

That Guangzhou was "transacting business" with Titan in the U.S. and directing negotiations in this country is enough for it to have waived immunity under § 1605(a)(2) with respect to the formation of the charter party at issue here. *See Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1113 (S.D.N.Y.1982); *see also Supra Med. Corp. v. McGonigle*, 955 F.Supp. 374, 382 (E.D.Pa. 1997) (finding sufficient "intentional communications with [plaintiff] giv[ing] rise to the underlying suit"). Titan's identity as a U.S. corporation further strengthens this conclusion. *See International Housing Ltd. v. Rafidain Bank Iraq*, 893 F.2d 8, 11 (2d Cir.1989) (fact that plaintiff is "a U.S. corporation .... is relevant to whether [its] financial losses ... constituted a 'direct effect'"); Note, Effects Jurisdiction Under the FSIA and the Due Process Clause, 55 N.Y.U. L. REV. 474, 512 (1980).[8]

Because we find a "significant, legal connection" with the U.S. giving rise to Titan's claim, which caused a direct effect in the U.S., we have subject matter under the FSIA with respect to the formation of the charter party.[9]

### B. *Personal Jurisdiction*

 For the same reasons, we conclude that the Court has personal jurisdiction over Guangzhou. *See Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir.1991) (citations omitted); *New York Bay Co. v. State Bank of Patiala*, No. 93 Civ. 6075, 1994 WL 369406, at *4 (S.D.N.Y. July 12, 1994); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 n. 3, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("personal jurisdiction, like subject matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity ... applies"). This is because under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir.1981). Since the Court has subject matter jurisdiction over the action and there is no dispute that defendant Guangzhou was properly served pursuant to 28 U.S.C. § 1608, the statutory requirements for personal jurisdiction are met.

 The FSIA, however, "cannot create personal jurisdiction where the Constitution forbids it." *Texas Trading*, 647 F.2d at 308. Consequently, "[e]ach finding of personal jurisdiction under the FSIA requires, in addition, a due process scrutiny of the court's power to exercise its authority over a particular defendant." *Id.; accord Seetransport*, 989 F.2d at 580. Due Process requires that the foreign sovereign entity have "minimum contacts" with the United States "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). In a case brought under the FSIA, a court may consider contacts beyond the forum state. *See Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir.1985) ("the proper inquiry in determining personal jurisdiction in a case involving federal rights is one directed to the totality of a defendant's contacts throughout the United States"); *see also* Graham C. Lilly, Jurisdiction Over Domestic and Alien Defendants, 69 VA. L. REV. 85, 130

---

**8.** The cases relied on by defendant do not dictate a different result. In fact, in two of these cases, the Court of Appeals suggested that the actions of a broker could be sufficient to confer jurisdiction over a foreign sovereign defendant. *See Stena Rederi AB v. Comision de Contratos*, 923 F.2d 380, 389 (5th Cir.1991); *Gregorian v. Izvestia*, 871 F.2d 1515, 1527–28 (9th Cir.1989). The Court declined to find subject matter jurisdiction in these cases, however, because the relevant facts either had not been timely presented, *see Gregorian*, 871 F.2d at 1528, or had not been presented at all to the district court, *see Stena Rederi*, 923 F.2d at 389.

**9.** It is not entirely relevant that Guangzhou did not initiate negotiations with Titan or solicit its business in the U.S. While a defendant that regularly does business in the U.S. will more easily be amenable to the general jurisdiction of this Court, with respect to the legal obligations arising out of the negotiation of the charter party, Guangzhou's communications, and those of its broker, are sufficient to establish subject matter jurisdiction.

(1983) ("it [is] reasonably clear that national—not state—contacts are decisive"). Moreover, "actions relevant to the [case] by an agent on [a] defendant[']s behalf" can support personal jurisdiction over a defendant. *Texas Trading*, 647 F.2d at 314.[10]

■ The Court concludes that it has personal jurisdiction over Guangzhou because Guangzhou hired Seagos, which is located in Connecticut, to broker the BIN HE, and which then directed communications at issue to Seabrokers and to Titan to negotiate the charter party. *See Reed Int'l Trading Corp. v. Donau Bank AG*, 866 F.Supp. 750, 755 (S.D.N.Y.1994) (exercising personal jurisdiction over foreign sovereign defendant where defendant had appointed U.S. bank as "advising bank" for letters of credit at issue); *Crimson Semiconductor, Inc. v. Electronum*, 629 F.Supp. 903, 905, 908 (S.D.N.Y.1986) (same, where defendant's representatives negotiated agreement in the U.S.). Moreover, there is evidence in the record to suggest that Guangzhou may have sent some of these communications directly to Seabrokers by fax from China. *See Sealift Bulkers, Inc. v. Republic of Armenia*, 965 F.Supp. 81, 85 (D.D.C.1997) (personal jurisdiction where defendant used U.S. telecommunications systems to correspond with plaintiff); *Hatzlachh Supply Inc. v. Savannah Bank of Nigeria*, 649 F.Supp. 688, 691 (S.D.N.Y.1986) (same). Accordingly, Guangzhou's contacts with the United States are sufficient to establish per-

sonal jurisdiction in this action. By appointing a representative in Connecticut to negotiate the charter party at issue in this case, Guangzhou "purposefully avail[ed] itself of the privilege of conducting activities with the [United States]." *Weltover*, 504 U.S. at 620, 112 S.Ct. 2160 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)) (alterations in original). Guangzhou may not avail itself of U.S. clients, by directing communications to the U.S., without being held responsible for the content of these communications in the U.S. *Accord Sealift*, 965 F.Supp. at 85–86. Given its conduct, Guangzhou should reasonably have expected that it could be haled into court here, were it to break off negotiations, because it directed the negotiations here, through Seagos, and because Titan, the target of its negotiations, is located here. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Hanil Bank*, 148 F.3d at 134; *see also Supra Medical*, 955 F.Supp. at 382–83 ("[defendant] cannot now ... complain about a suit concerning the effect of negotiations in the jurisdiction in which some of those negotiations occurred").[11]

### III. *Venue*

■ We also hold that venue is proper in this Court under 28 U.S.C. § 1391(b). Under this section, "a civil action wherein jurisdiction is not founded solely on the diversity

---

**10.** While plaintiff bears the burden of establishing the Court's personal jurisdiction over the defendant, *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986), plaintiff need only make a prima facie showing that jurisdiction exists where, as here, there has been no evidentiary hearing. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

**11.** We find unavailing respondent's argument that its contacts cannot be measured by the activities of its broker. (*See* Resp. Reply Mem. at 2–4.) Guangzhou maintained a relationship with Seagos whereby Seagos would "perform[ ] the usual broker's role of collecting hire on a charter .... [by] passing messages back and forth between the parties to a transaction ... and trying to smooth out trouble spots." (Chen Reply Aff. ¶¶ 2, 5.) Thus, Seagos played an "active role as an intermediary between [Guangzhou] and [Titan]," *International Housing*, 893 F.2d at 12, that

can be taken into account when determining jurisdiction, regardless of whether Seagos is deemed Guangzhou's "broker," "agent," or "representative." *See Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 537 (2d Cir.1975) ("[i]t is immaterial that [the intermediary] thought of himself as a 'broker' and not an 'agent' ... or that [defendant] did not intend to make [him] an agent"). Guangzhou does not anywhere question Seagos's authority to broker the arrangement at issue here. *Cf. Storr v. National Defence Sec. Council of the Republic of Indonesia–Jakarta*, No. 95 Civ. 9663, 1997 WL 633405, at *2–3 (S.D.N.Y. Oct.14, 1997) (considering whether signatories to promissory notes had actual or apparent authority from defendant); *In Matter of Arbitration Between Herlofson Mgmt. A/S*, 765 F.Supp. 78, 85–86 (S.D.N.Y.1991) (finding that broker did not have authority to "fix vessels without [defendant's] approval").

of citizenship ... may, except as otherwise provided by law, be brought only in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Despite its limiting language, courts have routinely held that § 1391(b) allows venue in more than one district. *See Bates v. C & S Adjusters*, 980 F.Supp. 865, 867 (2d Cir.1992) ("the admonition against recognizing multiple venues has been disapproved"); *PI, Inc. v. Quality Prods., Inc.*, 907 F.Supp. 752, 757 (S.D.N.Y.1995) ("Venue is proper in each district that is the situs of a substantial part of the events or omissions giving rise to the claim.").

■ Once an objection to venue has been raised, the plaintiff bears the burden of establishing that venue is proper. *D'Anton Jos, S.L. v. Doll Factory, Inc.*, 937 F.Supp. 320, 321 (S.D.N.Y.1996); *French Transit, Ltd. v. Modern Coupon Systems, Inc.*, 858 F.Supp. 22, 24 (S.D.N.Y.1994). Titan therefore bears the burden of establishing that a substantial part of the events giving rise to the lawsuit occurred in the Southern District of New York.

Titan argues that venue is proper here because the writings at issue were negotiated by means of facsimiles and telephone calls between Pelham, New York and Stamford, Connecticut. We agree. These faxes reflect "a substantial part of the events" giving rise to the present claim because the action alleges the creation of a binding charter party through these writings. *See Sacody Technologies, Inc. v. Avant, Inc.*, 862 F.Supp. 1152, 1157 (S.D.N.Y.1994) (venue requirements "may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action"); *see also Constitution Reinsurance Corp. v. Stonewall Ins. Co.*, 872 F.Supp. 1247, 1250 (S.D.N.Y. 1995) (venue proper in breach of contract action where contracts were negotiated through telephone calls and faxes between New York and Texas).

## IV. Summary Determination of the Making of a Charter Party

Now that the Court has determined that jurisdiction and venue are proper, we must determine whether the parties have agreed to arbitrate the formation of the charter party. We hold that they did not. However, the parties did enter into a binding charter party, by which they agreed to arbitrate disputes in London, upon the election of either party. Because Titan has petitioned this Court to order arbitration, we order such arbitration to determine the parties' rights under the charter party, pursuant to Shell Time 4.

### A. Ad Hoc Agreement to Arbitrate Existence of Charter Party

■ Guangzhou argues that the parties agreed to arbitrate the very existence of the charter party and, accordingly, that Titan's motion must be dismissed. We disagree. Given the evidence, we conclude that the parties did not enter into the "ad hoc" arbitration agreement advocated by Guangzhou.[12]

■ Because "arbitral jurisdiction is rooted in the consent of the parties," *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–41 (9th Cir.1991), the existence of an agreement to arbitrate is a threshold question for a court to resolve, absent a clear and unmistakable delegation of that authority to an arbitrator. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *AT & T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir.1996); *see also Maye v. Smith Barney Inc.*, 897 F.Supp. 100, 106 n. 3 (S.D.N.Y.1995) ("the question of whether the parties ever made an agreement to arbitrate is ... to be decided by the

**12.** While Section 4 of the FAA directs the court to conduct an evidentiary hearing where the existence of an arbitration agreement is in dispute, *see McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir.1980), no such hearing is required here because the parties agree to the material facts at issue. *See In re Stinnes Interoil, Inc.*, No. 87 Civ. 1371, 1989 WL 11409, at *4 (S.D.N.Y. Feb. 8, 1989).

courts"). While due regard must be given to federal policy favoring arbitration, *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), where the parties contest the formation of an agreement, "any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in [arbitration's] favor." *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir.1997) (citing *First Options*, 514 U.S. at 943, 115 S.Ct. 1920). The question of the formation of the charter party, like that of any other contract, is a question of federal common law. *See First Options*, 514 U.S. at 943, 115 S.Ct. 1920; *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.1987).

■ From the evidence, it is clear that the parties did begin negotiating an "ad hoc" arbitration agreement that contained terms different than the original charter party. According to the parties, on November 1 Seagos proposed arbitration to "resolve the dispute" as to whether the parties had made a binding charter. That same day, Titan proposed arbitration before a panel of three arbitrators in New York. However, the evidence also suggests that on November 2, Guangzhou cut off negotiations on the "ad hoc" agreement through Seagos, which, in response to Titan, stated that the "Shell Time 4" "is very clear on the [form of arbitration] which has been agreed by U.S. Titan. There is no need for a separate arbitration agreement." We find this language controlling; with it, Seagos, on behalf of Gu-

angzhou, definitively ended negotiations on the "ad hoc" agreement.[13] That it was Guangzhou's intent to end these negotiations is clear from its remaining correspondence, which called for London arbitration "pursuant to the Shell Time 4 clause 41." *Cf. Northern Tankers Cyprus Ltd. v. Lexmar Corp.*, 781 F.Supp. 289, 290–91 (S.D.N.Y. 1992) ("agreement to arbitrate, separate and distinct from that contained in the charter party," was formed where plaintiff demanded arbitration "for damages caused by [defendant's] non-performance of the charter," and defendant accepted that demand). Because the parties' negotiations with respect to the "ad hoc" agreement did not come to fruition, we cannot order arbitration on the issue of whether the charter party was in fact formed.

## B. *The Charter Party*

■ We do, however, order arbitration with respect to Guangzhou's alleged breach of the charter party, because we conclude that a charter party providing for arbitration was formed. Whether a charter party has been formed is a question of fact. *Sun Int'l Ltd. v. Terrabo Petroleum Co.*, 747 F.2d 108, 110 (2d Cir.1984). The Court, however, may determine whether a charter party exists, if the underlying material facts are not in dispute. *See Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 124 (2d Cir.1982). As with any other contract, a charter party is formed when there is a "meeting of the minds" on its essential terms. *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972); *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir.1974). It is not necessary that the proposed charter be signed by either party, *id.*, and even an oral charter party is enforceable by a court of

---

13. We are unpersuaded by Guangzhou's suggestion that it referred to the "Shell Time 4" and "Camaro pro forma" because the parties were familiar with the terms of such agreements, and not because the parties were in fact bound by those agreements. (*See* Chen Aff. ¶ 10; Resp. Reply Mem. at 15–16.) As defendant concedes, a party is bound by the natural meaning of its words. From this correspondence, Titan could only conclude that Guangzhou was referring to the arbitration clause in the charter party, which had been duly negotiated by Seagos and Sea-

brokers. Thus, we do not agree that by referring to the "agreement," Titan meant the "ad hoc" agreement at issue here. (*See* Resp. Mem. at 16.) If anything, confusion as to which agreement was being referenced during negotiations cuts in Titan's favor, that no "ad hoc" agreement to arbitrate was formed. Where parties' minds do not meet on the meaning of an essential term, no enforceable contract is formed. *See, e.g., Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864) (the famous "Peerless" case).

law, *Great Circle Lines*, 681 F.2d at 124 ("binding charter engagements have historically been assumed on nothing more formal than a nod of a head").

■ In any case, it is undeniable that charter parties can be and more often than not are formed by way of facsimile or telex. *See id.; In re J. Lauritzen A/S*, No. 84 Civ. 8704, 1986 WL 13441, at *2 (S.D.N.Y. June 5, 1986). This is because "[t]he shipping industry is a fast moving . . . business, where dealings between the parties . . . are usually conducted . . . under severe time restraints." *Great Circle Lines*, 681 F.2d at 125. To arrange expeditiously what would otherwise be complicated and time consuming, "brokers [customarily] receive and send telex [or fax] traffic all over the world." *Id.* On the facts before us, the existence of a binding charter party is clear. The parties negotiated a charter through their respective brokers, which was confirmed by facsimile on September 26, 1995 by Seabrokers, which "recap[ped] Owners and Charterers' agreement." A "recap" communication, or "fixture," is recognized throughout the shipping industry as an agreement to a charter party's essential terms. *See Great Circle Lines*, 681 F.2d at 125 & n. 2; *Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F.Supp. 1340, 1345 (S.D.N.Y.1988); *see also P.E.P. Shipping (Scandinavia) ApS. v. Normaco Shipping Corp.*, No. 96 Civ. 3136, 1997 WL 358118, at *2 n. 1 (E.D.La. June 24, 1997) ("[a] fixture presupposes a final contract with main terms set and final details to be resolved") (citing *Great Circle Lines*, 681 F.2d at 125 n. 2); *In re Herlofson Mgmt. A/S*, 765 F.Supp. 78, 81 n. 3 (S.D.N.Y. 1991)("[a] 'recap telex' recapitulates the terms of [a] fixture that have been agreed

upon").[14] Thus, the "recap" fax represented an agreement as to the charter party's main terms, which were in accordance with the Shell Time 4, a standard form charter. Accordingly, the parties had entered into a binding agreement as of September 26, 1995, which incorporated each of the Shell Time 4's terms. *Cf. Samsun*, 926 F.Supp. at 441 ("[t]he legal effect of adopting [form charter] is inescapable"); *Keystone Shipping Co. v. Compagnie Marocaine de Navigation*, No. 89 Civ. 1028, 1990 WL 104029, at *4 (S.D.N.Y. July 19, 1990) (fixture incorporating form charter is binding where it "embodi[ed]" form).

■ Moreover, we do not agree with defendant that the charter did not come into effect because of the alleged failure of one of its "subjects," the approval of the charter by Titan's board of directors upon receiving the final inspection report of the BIN HE. First, this argument directly contradicts the weight of the evidence, which suggests that the Board did approve the BIN HE within the agreed time period. Second, even had this "subject" failed, it did not vitiate the charter that had already been formed. It is well established that a "subject detail" does not create a condition subsequent to a charter party. *See Great Circle Lines*, 681 F.2d at 126; *In Matter of Arbitration Between Pollux Marine Agencies, Inc.*, 455 F.Supp. 211, 223 (S.D.N.Y.1978). In our opinion, there existed a binding charter party between Titan and Guangzhou, in the form of "Shell Time 4," beginning September 26, 1995. *Cf. E.A.S.T., Inc. of Stamford v. M/V Alaia*, 673 F.Supp. 796, 800 (E.D.La.1987) (charter not conditioned on plaintiff's acceptance of vessel because charter formed upon agreement of

---

14. We are equally unpersuaded by respondent's argument that John Raby's affidavit regarding industry custom should be ignored. "It is well established that testimony concerning trade practices and customs is admissible to enable the Court 'to evaluate the conduct of the parties.' " *Oriental Commercial & Shipping Co. v. Rosseel, N.V.*, 702 F.Supp. 1005, 1015 (S.D.N.Y.1988) (quoting *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir.1977)). Mr. Raby is an experienced ship broker and was one of Seabrokers' principals. He has personal knowledge not only of the negotiation of the charter party at issue, but the shipping industry as a whole.

Moreover, "[c]ertain long-standing customs of the shipping industry [such as the procedure for brokering charter parties] are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract." *Great Circle Lines*, 681 F.2d at 125. Thus, had Titan not submitted a statement as to industry practice in this case, we would nevertheless consider it here. *See id.; see also Samsun Corp. v. Khozestan Mashine Kar Co.*, 926 F.Supp. 436, 439 (S.D.N.Y.1996) ("established practices and customs of the shipping industry inform the court's analysis" of the making of a charter party).

main terms), *aff'd*, 876 F.2d 1168 (5th Cir. 1989).[15]

Because there exists a charter between the parties, Titan must arbitrate its dispute in London, according to the Shell Time 4. *Cf. Interocean*, 523 F.2d at 531 (form charter's arbitration clause bound parties where fixture telex adopted "Mobiltime form charter"); *Keystone*, 1990 WL 104029, at *4 (compelling arbitration where fixture provided that voyage be governed "per terms and conditions of the North American Grain charter party (pro forma 1982)," which contained arbitration clause); *In re Pollux*, 455 F.Supp. at 213–14 (same, where defendant confirmed "having fixed the foil ... subject details of Eldece Time," and aforesaid form charter had arbitration clause). The parties agreed to this form charter, as well as to the inclusion of an arbitration clause, until well after this dispute arose. As both parties were familiar to its form, it controls. *See P.E.P. Shipping*, 1997 WL 358118, at *3.

Moreover, even in the absence of a binding charter party, we would order arbitration in London under the Shell Time 4, because the parties agreed to arbitration in that forum by referencing that form charter while negotiating their own charter's terms. *See Samsun*, 926 F.Supp. at 441 ("A reference to a familiar charter party form which provides for arbitration ... binds the parties to arbitrate any disputes [in the forum provided] ... even though the formal charter party is not executed until later (or not at all)"). Respondent "was placed on notice, one way or the other," that disputes as to the charter party—including formation—could be arbitrated in London. *Id.* Thus, by ordering arbitration in London, the Court gives Guangzhou the benefit of its bargain.

### CONCLUSION

For the foregoing reasons, we grant petitioner's motion for a summary determination as to the formation of a charter party; deny respondent's cross motion to dismiss for lack

of jurisdiction and improper venue; deny respondent's application for attorney's fees; and grant respondent's motion to stay these proceedings to the extent consistent with this Opinion and Order. The parties are directed to arbitrate in London any other disputes arising under the time charter pursuant to the provisions of the Shell Time 4.

SO ORDERED.

---

**15.** Nor do we agree that Titan rejected the BIN HE by its fax of October 19, 1995. This fax states only that it had "concerns" regarding the condition of the BIN HE that Guangzhou had already been working on. In any event, because we have determined that the parties entered into a binding charter party on September 26, 1995, any communication by Titan in October would have no effect on its terms.