U.S. TITAN, INC., Petitioner–Appellee,

v.

GUANGZHOU ZHEN HUA SHIPPING CO., LTD., Respondent–Appellant.

Docket No. 98–9477.

United States Court of Appeals, Second Circuit.

Argued June 24, 1999.

Decided Feb. 15, 2001.

Stanley McDermott III, Piper & Marbury, L.L.P., New York, NY (Leo G. Kailis, Of Counsel) for Petitioner–Appellee.

Lizabeth L. Burrell, Burlingham Underwood LLP, New York, NY (Michael Marks Cohen, Of Counsel) for Respondent–Appellant.

Before: MINER, JACOBS, and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Respondent–Appellant Guangzhou Zhen Hua Shipping Co., Ltd. ("Zhen Hua") appeals from a judgment of the United States District Court for the Southern District of New York (William C. Conner,

Judge), entered October 7, 1998, upon an August 5, 1998 opinion and order, as amended September 25, 1998, granting the motion of Petitioner–Appellee to compel arbitration in London and denying the motion of Respondent–Appellant to dismiss on the grounds of lack of subject-matter jurisdiction, lack of personal jurisdiction, and improper venue, *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 16 F.Supp.2d 326 (S.D.N.Y.1998), ("*Titan I*"), and upon a September 29, 1998 opinion and order, clarifying the scope of arbitration, *see U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 182 F.R.D. 97 (S.D.N.Y.1998), ("*Titan II*").

■ On appeal, Zhen Hua contends principally that the district court exceeded the scope of its jurisdiction under the Federal Arbitration Act, 9 U.S.C. §§ 1–16, (the "FAA") by compelling arbitration of the parties' dispute pursuant to a charter party[1] allegedly negotiated by the parties in September 1995. More specifically, Zhen Hua argues that the court should not have determined whether the parties had formed a charter party because the parties had allegedly negotiated an "ad hoc" agreement to arbitrate that issue and that the court erred in finding that no such "ad hoc" agreement existed. In addition, Zhen Hua asserts that the district court lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603–1611, that the district court lacked personal jurisdiction over Zhen Hua, and that venue in the Southern District of New York was improper. For the reasons set forth below, we affirm.

## I. BACKGROUND

Petitioner–Appellee U.S. Titan, Inc. ("Titan") is a corporation organized under the laws of Texas, with its principal place of business in Pelham, New York. Zhen Hua is a state-owned corporation organized under the laws of the People's Republic of China, engaged primarily in the shipping industry, with its principal place of business in Guangzhou (also known as Canton), China.

### A. The Negotiations

In August 1995, Titan and Zhen Hua began negotiating a time charter[2] of the M/T BIN HE (the "BIN HE"), a ship owned by Zhen Hua. The parties conducted negotiations through two shipbrokers in Connecticut, Seabrokers (representing Titan) and Seagos (representing Zhen Hua). The two Connecticut brokers served as conduits for the transmission of many of the communications from one party to the other. Most of the parties' communications during the negotiations are memorialized in writings transmitted via facsimile or telex between and among the brokers and the parties. These communications establish the following chronology of the negotiations.

On September 22, 1995, Zhen Hua offered to charter the BIN HE to Titan for 12 months at $15,250 per day, with an option for an additional 12 months at $15,750 per day. The parties proceeded to negotiate different time periods and rates, as well as several other terms, the details of which are not relevant to the issues before us. On September 26, 1995, Zhen Hua sent Titan a "firm counter [offer]":

Accept/Except:

Period— 6 mos. plus/minus 30 days at CHOPT CHOPT next 12 mos.

Rates— $15,250 first period Optional $15,750 second period.

---

1. A charter party is a contract by which an entire ship or some principal part thereof is let to a merchant. The term "charter party" actually refers to the document in which the terms and conditions of the lease of a vessel by an owner to a charterer are set out.

*Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 124 (2d Cir.1982) (internal quotation marks and citations omitted).

2. A time charter is one of three principal forms of a charter party and constitutes a contract under which "the charterer engages for a fixed period of time a vessel, which remains manned and navigated by the vessel owner, to carry cargo wherever the charterer instructs." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11–1, at 169 (2d ed.1994).

Upon receipt of this telex, Titan informed its broker, Seabrokers, that "Charterers are in agreement and accept Owner[']s last offer." Seabrokers then sent via fax to Seagos and Titan a fixture "recap," confirming the "Owners and Charterers' agreement." The agreement was based on the "Shelltime 4 Time Charter," a standard time charter, see Michael Wilford et. al., *Time Charters* 28–36 (4th ed.1995), containing an arbitration clause that provides for arbitration in London at the election of either party.[3] The recap from Seabrokers to Seagos and Titan contained, in part, the following language:

> WE ARE PLEASED TO RECAP OWNER[']S AND CHARTERERS' AGREEMENT AS FOLLOWS, FOR THE TIMECHARTER OF:
> VESSEL:
> > MT BIN HE ...
>
> ...
>
> PERIOD— 6 MOS. PLUS/MINUS 30 DAYS AT CHOPT CHOPT NEXT 12 MOS. UNDERSTOOD ⇐/30 DAYS ONLY TO BE USED ONCE, DURING THE FINAL PERIOD.
>
> RATES— $15,250 FIRST PERIOD. $15,750 FOR OPTIONAL PERIOD[.]
>
> ...
>
> SUBJECTS—
> > CP DET'LS, SATISFACTORY INSPECTION OF THE VSL AT DD, RELEASE BY OWNERS FROM CAMARO TC, THENCE U.S. TITAN BOD APPROVAL WITHIN 3 DAYS FOLLOWING RECEIPT OF THEIR DENHOLM INSPECTION REPORT.[4]

3. Clause 41 of the Shell Time 4 Charter reads:
 41. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.
 (b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree, provided that London arbitration is understood and agreed to be the first form of dispute resolution.
 (c) Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving

After Zhen Hua dry-docked the BIN HE in Hong Kong, Denholm Ship Management (Overseas) Ltd. ("Denholm") conducted the inspection contemplated by the parties. Following a preliminary inspection, which revealed several problems with the ship, Zhen Hua apparently began considering a sale of the BIN HE.

On October 19, 1995, Titan received from Denholm an initial summary report on the drydock inspection. On October 23, Titan informed Seabrokers that it had concerns about the seaworthiness of the BIN HE, but would await Denholm's final report. Titan indicated also that it was interested in a "purchase option" and "would like to know what steps the Owner intends to take to bring the vessel up to an acceptable trading standard." Seabrokers relayed this message to Seagos, which, acting through Henry Chen, responded later that day:

> NOW OWNERS HAVE DECIDED TO SELL THE VESSEL ON CASH BASIS. THEY ARE ASKING $27 MILLION ON THE MARKET. BUT I RECKON WILL GO AT $26 MILLIONS [sic]. PROSPECTIVE BUYERS WILL BE INSPECTING THIS WEEK WHILE THE VSL IS STILL IN THE YARD.
>
> OWNERS THANK TITAN'S INTEREST AND ADVICE. THEY ASK U.S. TO CONVEY THEIR WILLINGNESS TO ENTERTAIN FUTURE BUSINESS PROPOSALS AND LOOK FOR-

written notice of election to the other party, elect to have any such dispute referred to arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act of 1950, or any statutory modification or re-enactment thereof for the time being in force.

4. At the time of the negotiations, the BIN HE was chartered to another party, Camaro. Consequently, Zhen Hua was required to obtain a release of the BIN HE from the "Camaro TC" in order to transfer possession to Titan.

WARD TO POSSIBLE COOPERATION.

On October 24, Titan faxed a message to Seabrokers, noting that the final inspection had not yet arrived and remarking:

It is encouraging that [Zhen Hua is] now in a position to sell the vessel if we do not exercise our option for the time charter. We assume therefore that the vessel has been successfully withdrawn from Camaro. We await Owners [sic] confirmation of this withdrawl [sic] per our %6 Agreement, so we can begin marketing the vessel for voyage and/or consecutive voyage charter.

Titan also asked Seabrokers to determine whether Zhen Hua would "provide a purchase option throughout the period of [its] charter."

On October 25, 1995, Seagos, through Chen, faxed Seabrokers, stating in relevant part:

WE KNOW THAT AFTER THE VSL FAILED THE SUB WITH U.S. TITAN ON MONDAY, [ZHEN HUA'S] PREFERENCE IS TO DO A STRAIGHT SALE ..., AND NOT TO GIVE PURCHASE OPTIONS. IF YOU THINK [TITAN] IS STILL INTERESTED IN THE TIME CHARTER OF THE VSL, PLEASE ASCERTAIN IF U.S. TITAN CAN TAKE [DELIVERY] OF THE VSL UPON OWNERS LIFT [sic] THEIR SUBJECT.

On the same day, Titan apparently became concerned that a misunderstanding might have developed between the parties. Consequently, Titan wrote again to Seabrokers,[5] which, in relevant part, states:

FIRST, LET ME BE PERFECTLY CLEAR WITH HENRY/OWNERS, MY FAX OF OCTOBER 23 WAS *NOT A REJECTION* OF THE VESSEL. IT IS DIFFICULT TO SEE HOW THIS COULD BE SO INTERPRETED. IN FACT IT WAS CLEARLY STATED THAT THE INSPECTION REPORT WAS DUE WEDNESDAY (TODAY) AND "WE ARE SERIOUS ABOUT THIS VESSEL." FRANKLY, OWNERS [sic] RECENT LACK OF RESPONSE CONVEYS THE IMPRESSION OF A RECENT DISINTEREST ON THEIR PART IN TRYING TO CONCLUDE THIS CHARTER....

WE RECEIVED THE FULL DENHOLM REPORT TODAY[, OCTOBER 25,] AND AFTER REVIEW AND ASSUMING OWNERS COOPERATION PER THE AGREED ELIGIBILITY CLAUSE, WE LIFT OUR INSPECTION SUBJECT.

WE NOW LOOK TO OWNERS TO LIFT THEIR CAMARO WITHDRAWL [sic] SUBJECT. THE TITAN BOARD WILL MAKE ITS DECISION WITHIN THE 3 WORKING DAYS AFTER THE LIFTING OF THIS SUBJECT PER OU[R] 9/26 AGREEMENT....

Seabrokers forwarded the fax to Henry Chen of Seagos.

On October 26, Chen informed Seabrokers that the BIN HE had been "WITHDRAWN FROM CAMARO," and stated that "[TITAN] APPROVED THE VSL BELATEDLY. HOWEVER, IF TITAN IS STILL SERIOUS WITH [sic] THE VSL, OWNERS CAN CONSIDER A [TIME CHARTER] ARRANGEMENT FOR THE TIME BEING." In response, on October 26 Titan advised Seabrokers that it was "PLEASED TO FINALLY LEARN ... THAT [THE] VESSEL [HAD BEEN] OFFICIALLY WITHDRAWN FROM THE CAMARO CHARTER AND [THAT] OWNERS [HAD] LIFTED THIS SUBJECT." Titan stated further that it would respond with its board's approval by the close of business on October 30. In fact, Titan's board of

---

**5.** The order of the two faxed communications of October 25, 1995, can not be discerned from the record.

directors approved the charter party on October 27.

On October 30, Titan sent a telex direct to Chen, as well as to Seabrokers, stating, in part, as follows:

CLEARLY, TITAN'S POSITION IS THAT IT HAS DONE WHAT WAS REQUIRED TO CONCLUDE THE 6 MONTH, OPTION 12 MONTH T/C CONTRACT WHICH IT HAD NEGO-TIATED, IE. THE $\frac{9}{26}$ AGREE-MENT....

THEREFORE, TITAN REQUESTS THAT OWNERS RECONSIDER THEIR WITHDRAWAL OF THE BIN HE AND ADVISE WHEN SHIP WILL BE AVAILABLE IN ITS NEXT POSITION. (REPORTED TO BE HONG KONG).

In response to a suggestion by Chen that the parties pursue expedited resolution of the apparent dispute, Titan faxed Chen directly on November 1, 1995:

Since we firmly believe that we entered into a binding fixture with Owners and therefore have a valid claim, we agree with your suggestion to seek an expedited resolution of this claim. We would suggest submitting this matter to three arbitrators in New York who would have 45 days to take evidence and issue a ruling on the threshold issue of whether the parties entered into a binding agreement on September 26 subject to conditions that were subsequently fulfilled.

Chen faxed Seabrokers on November 2:

PER OUR TELECON THIS MORNING AND SUBSEQUENT DISCUSSION WITH SOUTHERN SHIPPING'S CLAIM DEPT ..., SOUTHERN WILL RESPOND TO U.S. TITAN'S COMMENCEMENT OF ARBITRATION REQUEST. BUT PLS DO NOT DEVIATE BY INTRODUCING NEW FORUM SE-LECTION. SHELL TIME 4 CA-MARO PROFORMA IS VERY CLEAR ON THE SIMPLIFIED ARBITRATION WHICH HAS

BEEN AGREED BY U.S. TITAN AND AGREEABLE TO SOUTH-ERN SHIPPING AS WELL. THERE IS NO NEED FOR A SEPARATE [sic] ARBITRATION AGREEMENT AT AL [sic]

Later that day, Titan gave Seagos "formal written notice of Arbitration pursuant to the Shell Time 4 clause 41(c) of Camaro/Titan Charter Party."

Titan apparently found the references to Southern Shipping in Seagos's November 2 fax confusing, writing on November 7:

We refer to our fax of November 2 commencing arbitration pursuant to Clause 41(c) of the Camaro/Titan Charter Party. We want to make clear that Titan has agreed to arbitrate with [Zhen Hua], with whom the Camaro/Titan fixture was negotiated, and not with any other party, including Southern Shipping. Please therefore confirm immediately that [Zhen Hua] has agreed to arbitrate Titan's claims against it in accordance with Clause 41(c) of the Charter.

Replying that same day, Chen faxed Seabrokers:

ACKNOWLEDGE RECEIPT OF U.S. TITAN'S FAX OF YESTERDAY. HEREWITH CONFIRM THAT ARBI-TRATION WILL BE BETWEEN ... TITAN ... AND ... ZHEN HUA ... NOT ANY OTHER PARTY INCLUD-ING SOUTHERN SHIPPING. AC-CORDINGLY, LONDON ARBITRA-TION SHUD [sic] BE COMMENCED IN ACCORDANCE WITH CLAUSE 41(C) OF THE SHELL TIME 4 CA-MARO PROFORMA.

On November 9, Titan requested that Seagos, "FOR THE SAKE OF GOOD ORDER, ... *CONFIRM* THAT THE AR-BITRATION PROCEEDINGS IN LON-DON ARE TO COMMENCE IN ACCOR-DANCE WITH CLAUSE 41(C) OF THE SHELL TIME 4 [ZHEN HUA]/TITAN PROFORMA, WHICH IS BASED ON

THE 'CAMARO' CHARTER." The same day, Chen responded:

THANX JOHN'S FAX TO WHICH OWNERS REPLY THAT THEY CAN REITERATE THAT BOTH SIDES HAVE AN AGREEMENT TO ARBITRATE IN LONDON VIA SIMPLIFIED PROCEDURE ACCORDING TO SHELL TIME 4 CLAUSE 41(C) CAMARO PROFORMA TO ASCERTAIN WHETHER THERE IS A CHARTER BETWEEN GUANGZHOU ZHEN HUA AND U.S. TITAN. GUANGZHOU ZHEN HUA WILL WORK WITH U.S. TITAN IN THE ARBITRATOR NOMINATION PROCESS TO EXPEDITE THIS ARBITRATION PROCEDURE.

Titan replied on November 10:

ACKNOWLEDGE YOUR FAX OF 9TH NOVEMBER.

WE CONFIRM ARBITRATION IN LONDON IS ACCEPTABLE PER THE AGREEMENT.

WE LIST BELOW OUR NAMES OF THREE ARBITRATORS AND REMIND [ZHEN HUA THAT IT] NEED ONLY AGREE ON ONE. SHOULD NONE BE ACCEPTABLE, PLEASE HAVE OWNERS ADVISE U.S. SOONEST [sic] OF THEIR LIST OF THREE ALTERNATIVES.

IF WE ARE UNABLE TO COME UP WITH A SOLE ARBITRATOR THROUGH THIS PROCEDURE, WE RECOMMEND THAT EACH PARTY NOMINATE A SOLE ARBITRATOR AND THEN THEY WOULD AGREE ON A THIRD.

Titan also listed its three nominees in the fax.

On November 24, Zhen Hua sent a fax directly to Titan stating, "WE, AS PRIOR DISOPPONENT OWNER OF BIN HE, HEREBY AGREE TO SUBMIT THIS MATTER TO LONDON ARBITRATOR PURSUANT TO THE SHELL TIME 4 CLAUSE 41. NO DOUBT THIS DISPUTE WILL BE GOVERN [sic] BY ENGLISH LAW." Zhen Hua then listed three nominees of its own, apparently indicating that Titan's nominees were unsatisfactory.

On November 28, 1995, Titan acknowledged that the parties had not reached agreement on a sole arbitrator and suggested a procedure for appointing a panel of three arbitrators. Titan added, "PLEASE ADVISE IF THIS PROCEDURE IS AGREEABLE. WE WILL THEN NOTIFY YOU OF OUR APPOINTED ARBITRATOR." Zhen Hua responded,

AS TO THE ARBITRATION PROCEDURE, WE PERFER [sic] TO MAINTAIN THAT ONLY ONE LONDON ARBITRATOR WOULD BE APPOINTED BY BOTH PARTIES ACCORDING TO THE AD HOC ARBITRATION CLAUSE. OBVIOUSLY THIS PROCEDURE WILL SAVE YOUR AND OUR TIME AND COST. WE THEREFORE WOULD BE GRATEFUL IF YOU COULD PROVIDE ANOTHER LIST OF ARBITRATOR[S] FOR OUR ELECTION.

Titan never submitted another list of arbitrators. Instead, more than two months later on February 7, 1996, Titan sent a fax to the attention of Chen at Seagos:

AFTER A REVIEW OF OUR FILE INCLUDING THE RECENT CORRESPONDENCE BETWEEN U.S. ON THE ISSUE OF ARBITRATION IN LONDON, IT APPEARS TO U.S. THAT WE DO *NOT* HAVE:

1.) YOUR CLEAR AGREEMENT THAT [ZHEN HUA] IS THE APPROPRIATE PARTY IN DISPUTE WITH U.S. TITAN. OTHERWISE, WHY THE CORRESPONDENCE TO U.S. BY THE "FORMER DISPONENT OWNERS" SOUTHERN SHIPPING WHICH IS IRRELEVANT.

2.) AN ACKNOWLEDGEMENT BY YOU THAT WE HAVE A BINDING CHARTER PARTY AGREEMENT; RATHER, WE ·HAVE OBLIQUE

REFERENCES TO THE "PRO FORMA CAMARO CHARTER" AND AN AD HOC ARBITRATION CLAUSE. WE WILL *NOT* AGREE TO ARBITRATION OUTSIDE OF THE BINDING TITAN/[ZHEN HUA] CHARTER. GIVEN THE ABSENCE OF SUCH AN ACKNOWLEDGEMENT, WE SEE NO REASON TO CONCLUDE THAT LONDON IS THE JURISDICTION FOR THIS DISPUTE, AND WE ARE INITIATING LITIGATION AGAINST [ZHEN HUA] IN NEW YORK COURTS.

Later that day, Zhen Hua responded:

1. IT IS VERY CLEAR FROM THE ALLEGED C/P AND THE CORRESPONDENCE REGARDING THE ARBITRATION THAT THE PARTY INVOLVED ON THE PART OF "OWNER" IS [ZHEN HUA]. PLEASE CLARIFY WHY YOU REFER TO "SOUTHERN SHIPPING" MANY TIMES.

2. YOU ARE NOT ALLOWED TO BE IN BREACH OF THE AD HOC ARBITRATION CLAUSE WHICH IS ACTUALLY RUNNING.

3. WE ARE STILL WAITING FOR YOUR ANOTHER [sic] LIST OF LONDON ARBITRATOR[S].

B. *The Proceedings Below*

On February 7, 1996, Titan filed a petition to compel arbitration pursuant to section 4 of the FAA in the United States District Court for the Southern District of New York. Titan requested "a summary determination of the making of a binding charter party contract between Titan and respondent [Zhen Hua] and to compel [Zhen Hua] to arbitrate Titan's claim for breach of that charter party." In its petition, Titan argued:

Since the charter contract between [Zhen Hua] and Titan is a condition precedent to the arbitration agreement incorporated into that contract, the Court must determine the threshold issue whether the parties entered into that contract. Therefore, pursuant to 9 U.S.C. § 4, Titan requests that the Court proceed summarily to try the question of whether [Zhen Hua] and Titan agreed to a binding charter contract. Titan further requests that the Court, upon finding that [Zhen Hua] entered into a binding contract with Titan, pursuant to 9 U.S.C. § 4 and § 206, forthwith direct [Zhen Hua] to arbitrate any remaining issues including damages in accordance with the charter party arbitration agreement.

On October 29, 1996, Zhen Hua gave notice of its motion to: (1) dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(2), based on lack of personal jurisdiction over Zhen Hua; (2) dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(1), based on lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1603–1611, (the "FSIA"), and based on the existence of an "ad hoc" agreement to arbitrate whether the parties had formed a binding charter party; (3) in the alternative, dismiss the petition pursuant to Fed.R.Civ.P. 12(b)(3) and 28 U.S.C. § 1391(f) for improper venue; and (4) in the alternative, stay the proceedings pursuant to section 3 of the FAA and section 208 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208, (the "Convention").

On August 5, 1998, the district court issued its first of two opinions, holding that the parties had *not* formed an "ad hoc" arbitration agreement but that they had formed a binding charter party, granting Titan's motion to compel arbitration pursuant to the arbitration clause contained in the charter party, and denying Zhen Hua's cross-motion to dismiss the petition. *See Titan I,* 16 F.Supp.2d at 330, 340. The court also stayed the proceedings pending arbitration in London. *See id.* at 330, 330 n. 1, 340.

Subsequently, Zhen Hua moved to alter or amend the opinion and order pursuant

to Fed.R.Civ.P. 59(e) and Local Civil Rule 6.3, on the ground that the court's opinion "did not fully identify the issues left open for consideration by the arbitrators in London." *Titan II*, 182 F.R.D. at 99 (internal quotation marks omitted). Zhen Hua argued that *Titan I* made "unclear to the arbitrators whether they may excuse the parties' performance under the charter if respondent can prove that the 'subjects' or conditions were not satisfied." *Id.* at 101. In opposition, Titan argued that the opinion "unambiguously and correctly limited the scope of the arbitrators' authority." *Id.* at 99.

In its second opinion, the district court noted first that "[t]he pivotal issue is whether the arbitrators may excuse the parties from their obligations under the charter in the event that one of the subjects, or conditions[,] has not been satisfied." *Id.* at 99–100 (internal quotation marks omitted). *Id.* Having characterized the issue as such, the district court then held:

> We grant respondent's motion to the extent of specifying that the parties must arbitrate in London all disputes arising under the charter party. Thus, the arbitrators may determine whether the actions of either party, subsequent to the formation of the charter party, have vitiated the agreement. Any parts of our prior Opinion which suggested otherwise are hereby withdrawn.

*Id.* at 101.[6]

An amended judgment was entered on October 7, 1998. This appeal followed.

## II. DISCUSSION

On appeal, Zhen Hua argues that the district court erred in several regards. First, Zhen Hua asserts that in November 1995 the parties reached an "ad hoc" agreement, separate and distinct from the provisions of the charter party, for the

purpose of arbitrating whether the parties had ·entered into a charter party. If so, contends Zhen Hua, the FAA cloaked the district court with jurisdiction *only* to order arbitration in accordance with that agreement, leaving the issue of charter party formation to the arbitrator. Second, Zhen Hua contends that the district court lacked subject-matter jurisdiction under the FSIA. Third, Zhen Hua asserts that the district court lacked personal jurisdiction over Zhen Hua because Zhen Hua did not have "substantial" or "continuous and systematic" contacts with the United States. Finally, Zhen Hua claims that venue in the Southern District of New York was improper. For the reasons stated below, we disagree with Zhen Hua and affirm the decision of the district court.

### A. The Purported Agreements

The district court held that the parties did not enter into an "ad hoc" agreement to arbitrate whether they had formed a charter party, but did conclude that the parties had formed a charter party that included an arbitration clause requiring the parties to submit charter-related disputes to arbitration in London. As a result, the court granted Titan's motion to compel arbitration pursuant to the charter party and stayed the litigation pending such arbitration. On appeal, Zhen Hua argues that, as a matter of law, the parties' communications established an "ad hoc" arbitration agreement that, under the FAA and the Convention, delegated authority to an arbitrator in London to determine whether the parties had formed a charter party. We disagree.

### 1. Standard of Review

Before addressing the merits of Zhen Hua's argument, we must resolve the parties' dispute over the standard of review applicable to the district court's conclusions about the existence, or lack thereof,

---

6. Because the judgment had not yet been entered pursuant to the August 5 opinion, the court found Rule 59(e) to be inapplicable and instead treated Zhen Hua's motion as an attempt to obtain "clarification" of the opinion under Local Rule 6.3. *See id.* at 100–01.

of the two purported agreements. According to Zhen Hua, the district court decided the contractual formation issues as a matter of summary judgment and therefore our review is de novo. In response, Titan contends that the district court appropriately made findings of fact based on the parties' evidentiary submissions and that we review such findings, including the court's factual findings on formation, for clear error.

█ The determination of whether there was a meeting of the minds sufficient to constitute a contract is one of fact. *See Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 534 (2d Cir.1975). This remains true regardless of whether the contract at issue is an arbitration agreement, *see Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir.1987) ("Based on [written] exchanges and after a detailed review of the voluminous evidentiary submissions, the district court found that [plaintiff] had agreed to arbitrate its disputes under both the signed and unsigned agreements with ... defendants. We see no reason to disturb this factual finding."), or a charter party, *see Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121, 125 (2d Cir.1982) ("Whether there was a meeting ·of the minds resulting in a charter party is a question of fact.").

When parties disagree about whether they entered into an arbitration agreement subject to the FAA, the FAA directs that the "court shall proceed summarily to ... trial" of the issue. 9 U.S.C. § 4. Contrary to Zhen Hua's characterization of the proceedings below, the district court's opinion and the record make clear that the district court did try the issue of whether the parties formed an agreement to arbitrate. Although the district court did not hold an evidentiary hearing, the parties filed multiple briefs and extensive evidence with the court over a two-year period. Most significantly, the parties submitted the telex and facsimile communications that were alleged to have formed the "ad hoc" arbitra-

tion agreement (according to Zhen Hua) and the charter party (according to Titan). No dispute existed as to the authenticity of these communications. Instead, the parties disagreed over the meaning of the communications.

█ In addition, Zhen Hua did not and does not now seek an evidentiary hearing. Nowhere in its briefs does Zhen Hua assert that it requested the district court to hold an evidentiary hearing. Furthermore, Zhen Hua does not contest (or even address) the district court's statement in footnote twelve of its first opinion that notwithstanding "[s]ection 4 of the FAA ..., no such hearing [was] required." *See Titan I*, 16 F.Supp.2d at 337 n. 12 (internal citation omitted). Finally, Zhen Hua explicitly disclaims that the case should be remanded to the district court for such a hearing:

> *Neither Titan nor Zhen Hua seeks remand for a factual trial, nor is a trial appropriate when the sole issue is whether, as a matter of law and through application of the presumption favoring arbitration, the parties' communications reflect an enforceable agreement to arbitrate the issue of charter formation.*

Appellant's Reply Br. at 12–13 (emphasis added). Consequently, under the circumstances of the matter *sub judice,* we hold that the district court tried the issue of formation (of both purported agreements) on the papers and that Zhen Hua has waived any right under the FAA to an evidentiary hearing.

█ The correct standard of review of the facts found by the trial court is contained in Rule 52(a) of the Federal Rules of Civil Procedure: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." As stated in the rule, the "clearly erroneous" standard of review controls our· consideration of the factual findings of the district court *even though based upon a documentary record. See Anderson v. City of Bessemer City,*

*North Carolina,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We are not permitted to find the district court's findings of fact to be clearly erroneous if the findings are one of two permissible views of the evidence. *See id.*

### 2. *Formation of the Purported Agreements*

■ "The Federal Arbitration Act creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.' " *PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir.1996) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Arbitration agreements subject to the Convention are enforced in accordance with Chapter 2 of the FAA. *See* 9 U.S.C. § 201. An agreement to arbitrate exists within the meaning of the Convention and the FAA if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope. *See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir. 1999); *see also* 9 U.S.C. § 202. Upon finding that such an agreement exists, a federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement.

■ Zhen Hua and Titan argue over whether the first requirement, i.e., the existence of a written agreement to arbitrate, has been met with regard to the "ad hoc" agreement and the charter party. Under the Convention a written agreement "include[s] an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." 9 U.S.C. § 201, Convention on the Recognition and Enforcement of Foreign Arbitra-

ble Awards, Art. II(2).[7] Notwithstanding the strong federal policy favoring arbitration as an alternative means of dispute resolution, *see David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London),* 923 F.2d 245, 248 (2d Cir.1991), courts must treat agreements to arbitrate like any other contract, *see Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). A contract is formed when there is a meeting of the minds of the parties on the essential terms of an agreement. *See Interocean Shipping,* 523 F.2d at 534. A court must therefore examine the parties' written communications to determine whether they have formed an agreement to arbitrate enforceable under the FAA and the Convention.

### a. *The "Ad Hoc" Arbitration Agreement*

The district court considered Zhen Hua's argument that in November 1995 the parties reached a separate, "ad hoc" agreement to arbitrate whether the parties had *formed* a binding charter party. Preliminarily, the court noted that "the existence of an agreement to arbitrate is a threshold question for a court to resolve, absent a clear and unmistakable delegation of that authority to an arbitrator." *Titan I,* 16 F.Supp.2d at 337 (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). The court also observed that "where the parties contest the formation of an agreement, 'any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in [arbitration's] favor.' " *Id.* at 338 (quoting *Abram Landau Real Estate v. Bevona,* 123 F.3d 69, 72 (2d Cir.1997) (citing *First Options,* 514 U.S. at 943, 115 S.Ct. 1920)). The court

---

**7.** The text of the Convention is found immedi- ately following 9 U.S.C. § 201.

then found that although the parties had begun negotiating such an "ad hoc" agreement around November 1, Zhen Hua cut off such negotiations on November 2 when it stated, "There is no need for a separate arbitration agreement." *Id.* Therefore, the court concluded, the parties never formed a separate agreement to arbitrate whether they had formed a charter party.

On appeal, Zhen Hua argues that the district court erroneously relied on *First Options* to require evidence that the parties had "clear[ly] and unmistakabl[y]" delegated authority to an arbitrator to decide the question of *charter* formation. Instead, Zhen Hua contends, the district court should have applied the contract formation standards articulated by the Convention to find that the parties had formed an "ad hoc" agreement to arbitrate formation of the charter party.

In *First Options,* the Supreme Court addressed, *inter alia,* the "narrow" issue of the appropriate "standard of review applied to an arbitrator's decision about arbitrability." 514 U.S. at 942, 115 S.Ct. 1920. In defining this issue, the Court delineated the three types of disagreement between the parties: (1) whether the defendants were liable to the plaintiffs; (2) whether the parties agreed to arbitrate the issue of liability; and (3) whether the courts or the arbitrators possess the primary power to decide the second question. *See id.* The issue presented to the Supreme Court was the third question, which the Court reformulated as "Does that power belong primarily to the arbitrators (because the court reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)?" *Id.* Answering this question, the Supreme Court held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e] evidence that they did so,'" *id.* at 944, 115 S.Ct. 1920 (second and third alterations in the original), and that any silence or ambiguity about whether such a question is

arbitrable reverses the usual presumption that issues should be resolved in favor of arbitration, *see id.* at 944–45, 115 S.Ct. 1920; *Abram Landau,* 123 F.3d at 72–73 (citing, *inter alia, First Options,* 514 U.S. at 943, 115 S.Ct. 1920).

Zhen Hua is correct that the standard articulated by the Supreme Court in *First Options* is not apposite to the precise question presented to the district court. Unlike *First Options,* the instant case required the district court to determine whether the parties formed an "ad hoc" agreement to arbitrate whether they had formed a charter party—an issue analogous to the second of the three disagreements between the litigants in *First Options.* On appeal, neither Zhen Hua nor Titan contends that an arbitrator should resolve this question; instead the parties disagree as to whether the court below correctly answered this question.

Zhen Hua errs, however, in asserting that the district court applied the *First Options* standard in deciding whether the parties had formed an "ad hoc" arbitration agreement. When read in context, the passage of the district court's opinion relying on *First Options* (and *Abram Landau*) makes clear that the district court invoked the standard only to note *preliminarily* that the dispute over formation was properly before it rather than an arbitrator. *See Titan I,* 16 F.Supp.2d at 337–38. Furthermore, the ensuing analysis by the district court reveals that the district court correctly evaluated the written communications under general principles of the law of contract formation (consistent with the Convention) in finding that Zhen Hua had terminated negotiations over an "ad hoc" arbitration agreement. *See Genesco,* 815 F.2d at 845 ("[Under the FAA] whether [a party] is bound by [an] arbitration clause . . . is determined under federal law, which comprises generally accepted principles of contract law.").

■ Having determined that the district court did not apply the *First Options* standard, we conclude further that the district

court did not commit clear error in finding that the parties did not reach a binding "ad hoc" agreement to arbitrate the issue of formation of the charter party. On November 2, 1995, Zhen Hua rejected Titan's proposal to arbitrate the issue of charter formation in New York, stating:

> PLS DO NOT DEVIATE BY INTRODUCING NEW FORUM SELECTION. SHELL TIME 4 CAMARO PROFORMA IS VERY CLEAR ON THE SIMPLIFIED ARBITRATION WHICH HAS BEEN AGREED BY U.S. TITAN AND AGREEABLE TO SOUTHERN SHIPPING AS WELL. THERE IS NO NEED FOR A SEPARATE [sic] ARBITRATION AGREEMENT AT AL [sic].

The district court did not commit clear error in finding this statement to be a rejection of the idea of an arbitration agreement extraneous to the charter party. However, even if *we* were to interpret the statement to constitute an acceptance of the offer to arbitrate charter formation combined with a proposal that the parties employ the procedures set forth in the form agreement serving as the basis for the purported charter party, we could not override the factfinder's interpretation because the November 1 communication is certainly susceptible of both meanings.

Subsequent communications between the parties bolster our conclusion that the district court's findings were not clearly erroneous. The November 7 communication from Zhen Hua acknowledged Titan's notification of arbitration pursuant to Clause 41(c) of the charter party, and removed the confusion over previous references to "Southern Shipping," but failed to specify that the parties were arbitrating the issue of the formation of the charter. Titan then requested confirmation that the parties were agreeing to arbitrate in accordance with the very charter party to which Titan believed Zhen Hua was bound. Although Zhen Hua replied that "[o]wners ... reiterate that both sides have an agreement to arbitrate in London via sim-

plified procedure according to Shell Time 4 Clause 41(c) Camaro Proforma to ascertain whether there is a charter between Guangzhou Zhen Hua and U.S. Titan," Titan never responded to this suggestion that the parties were arbitrating the issue of the existence of the charter party. Instead, Titan responded that arbitration was acceptable "per the agreement," which the district court reasonably construed to mean the charter party itself. *See Titan I,* 16 F.Supp.2d at 338 n. 13. From November 1995 until February 1996, the parties dickered over arbitrators, never clarifying what exactly they were arbitrating or which agreement bound them to arbitrate. As a result, we hold that the district court did not commit clear error by finding that the negotiations never resulted in a "meeting of the minds" sufficient to form a binding "ad hoc" agreement to arbitrate whether they had entered into a charter party.

### b. *The Charter Party*

Although the district court determined that the parties did not form an "ad hoc" arbitration agreement, the district court granted Titan's motion to compel arbitration on the ground that the parties had formed a binding charter party that included an arbitration clause. Specifically, the court concluded that the parties formed a charter party through their respective brokers no later than September 26, 1995, on which date Titan's broker (Seabrokers) confirmed the agreement by faxing both parties a "recap" or "fixture." *See id.* at 339. Relying on this Court's decision in *Great Circle Lines,* the district observed that "[a] 'recap' communication, or 'fixture,' is recognized throughout the shipping industry as an agreement to a charter party's essential terms." *Titan I,* 16 F.Supp.2d at 339 (citing *Great Circle Lines,* 681 F.2d at 125, 125 n. 2). In the court's view, the "recap" embodied the charter party's main terms by incorporating the terms of Shell Time 4 Charter, a

standard form charter, which included an arbitration clause. *See id.*

The court then rejected on two grounds Zhen Hua's argument that the charter party did not come into force due to the alleged failure of one of its "subjects"—the approval of the charter party by Titan's board of directors upon receipt of the inspection report. First, the court found that the weight of the evidence demonstrated that Titan's board did approve the charter party within the agreed time period. *See id.* Second, relying again on *Great Circle Lines*, the court held that "a 'subject detail' does not create a condition subsequent to a charter party." *Id.* As a result, the court ordered that the parties arbitrate in London pursuant to the charter party's arbitration clause any disputes arising under the charter party. *See id.* at 340. In a subsequent opinion the court clarified that the London "arbitrators may determine whether the actions of either party, subsequent to the formation of the charter party, have vitiated the agreement." [8] *Titan II,* 182 F.R.D. at 101.

On appeal, Zhen Hua contends that the district court made an erroneous finding as to the existence of a charter party. Zhen Hua does not contest, however, that the district court's finding was in accordance with the standard set forth in *Great Circle Lines*, which holds that a "recap" communication, such as the one sent on September 26, 1995 in the instant case, represents "an agreement as to the charter party's main terms," with the "subject details" being no more than an acknowledgment of an intention to continue negotiations. Instead, Zhen Hua calls for the overruling of *Great Circle Lines*, asserting that its holding conflicts with the laws of the United Kingdom and with the trade practices of the shipping industry at large. Unpopular though it may be, *Great Circle Lines* is binding precedent, and we "will not over-

rule a prior decision of a panel of this Court absent a change in the law by higher authority or by way of an in banc proceeding of this Court." *Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.1993).

Given that the district court (as well as this Court) is bound by *Great Circle Lines,* the district court correctly applied *Great Circle Lines* to find that the parties had formed a charter party. Under *Great Circle Lines,* the September 26, 1995 "recap" constituted proof of a binding agreement or "fixture," which is "a commitment that a voyage will be performed," and one which "presupposes a final contract, with main terms set, and final details to be resolved subsequently." 681 F.2d at 125 n. 2. As explicated in *Great Circle Lines,*

[c]harter parties are formed in two stages. First, significant "main" terms are negotiated through brokers. These terms usually include the name of the charterer, name of owner, ship, and its characteristics, time and place of delivery, duration of charter, place of redelivery, hire rate, printed form upon which the contract is based, and any other term that a party deems important. These are considered the "bare-bones" of the contract. The "main" terms when agreed upon are entitled a "fixture." Second, after a "fixture" has been reached, the parties continue to negotiate "details" amending the form contract specified in the "fixture." These minor or side issues "flesh-out" the original agreement or fixture. The "details" include a wide variety of matters, for example: fuel used, speed of vessel, condition of ship's holds, exact time of ship's delivery to charterer, brokerage, breakdown, bunkering, option to extend charter, cargo capacity, demurrage and

---

8. In so holding, the court withdrew inconsistent portions of its previous opinion, which would appear to include its factual finding that Titan's board satisfied the post-inspection approval "subject." *See Titan II,* 182 F.R.D. at 102 ("Accordingly, a factual dispute as to whether one of the stated conditions has been satisfied, and the effect of such failure, are issues for the arbitrators, not the Court.")

whatever else is deemed by the parties to be of minor importance.

*Id.* at 125 (footnote omitted). In other words, Titan and Zhen Hua formed an enforceable agreement to charter the BIN HE, subject to certain conditions, including: (1) "CP Details," i.e., future agreement between the parties about charter party terms other than those enumerated in the broker's recap; (2) a satisfactory inspection of the ship in drydock; (3) the ship's release from a time charter to a company called Camaro, to which it was still chartered at the time; and (4) approval by Titan's board of directors of the proposed charter within 3 days of receipt of the drydock inspection report. Consequently, even if Titan's board did fail to timely approve the charter, such failure would not prevent or undo formation of the charter party. Instead, the failure (if any occurred) would constitute a breach of the charter party for which the London arbitrator may impose a remedy consistent with the terms of the charter party and English law (which, under the charter par-

ty, controls the interpretation of the agreement).[9]

**B.** *Subject Matter Jurisdiction under the FSIA*

Zhen Hua moved the trial court to dismiss Titan's petition for lack of subject matter jurisdiction on the ground Zhen Hua was immune from suit under the FSIA. The district court agreed with Zhen Hua, and no dispute exists here, that Zhen Hua qualifies as a "foreign state" under the FSIA because it is a corporation owned by the People's Republic of China.[10] *See Titan I,* 16 F.Supp.2d at 333. Nevertheless, the district court held that Zhen Hua fell within two exceptions to the FSIA's grant of jurisdictional immunity to foreign states: (1) the arbitration exception, *see* 28 U.S.C. § 1605(a)(6)(B); and (2) the commercial activities exception, *see id.* § 1605(a)(2).[11] *See Titan I,* 16 F.Supp.2d at 334, 335. Because we hold the former exception applicable, we do not address the latter.

 The standard of review applicable to district court decisions regarding sub-

9. Furthermore, although Zhen Hua does not raise the issue, we note that the district court was required under the FAA and the Convention to determine whether the parties had formed the charter party, as a whole, rather than ordering arbitration under the charter party's arbitration clause on the ground that it was separable from the charter party. Although a sufficiently broad arbitration clause may be separated from the contract in which it is embedded to permit arbitration of the enforceability of the contract itself, *see Prima Paint Corp.,* 388 U.S. at 403–05, 87 S.Ct. 1801 (1967); *Genesco,* 815 F.2d at 845 (compelling arbitration of fraudulent inducement claim pursuant to clause providing for arbitration of "[a]ll claims and disputes *of whatever nature* arising under this contract") (emphasis added), the instant clause—covering "[a]ny dispute arising under this charter"—does not rise to the required level of expansiveness, *see In re Kinoshita & Co.,* 287 F.2d 951, 953 (2d Cir.1961) (holding clause that provided for arbitration "[i]f any dispute or difference should arise under this Charter" too narrow to include arbitration of fraudulent inducement claim).

10. The FSIA provides that "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Under the FSIA a " 'foreign state' ... includes ... an agency or instrumentality of a foreign state," which, in turn, is defined to include "any entity ... which is a separate legal person, corporate or otherwise, and ... a majority of whose shares or other ownership interest is owned by a foreign state." 28 U.S.C. § 1603(a), (b).

11. District courts have
original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of [Title 28] as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of [Title 28] or under any applicable international agreement.
28 U.S.C. § 1330(a).

ject matter jurisdiction under the FSIA is clear error for factual findings and de novo for legal conclusions. *See Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 930 (2d Cir.1998).

The so-called arbitration exception to the FSIA provides in pertinent part:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . .

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . .

28 U.S.C. § 1605(a). The district court found that, because China and the United States were both signatories to the Convention, and because Titan alleged that the parties had entered into a charter party containing an arbitration clause, it had jurisdiction to determine whether the parties formed an agreement to arbitrate so as to vitiate Zhen Hua's immunity under the FSIA. *See Titan I,* 16 F.Supp.2d at 334.

On appeal, Zhen Hua contends that, because there was an "ad hoc" agreement to arbitrate the issue of whether a charter party existed, the arbitration clause in the "alleged charter" could not form the basis for waiver of immunity by Zhen Hua under § 1605(a)(6)(B). Zhen Hua further asserts that the exception "might have applied if *Titan* had sought to enforce the 'ad hoc' agreement* and to compel [Zhen Hua]

to arbitrate in London the question of whether a binding charter had been concluded [but that] Titan . . . never asked for such relief, nor did [Zhen Hua], who raised the 'ad hoc' agreement only defensively in seeking dismissal or a stay of the suit." Appellant's Brf. at 20.

■ In light of our ruling above that the district court did not commit clear error in finding that parties did *not* form an "ad hoc" arbitration agreement, we need not further address Zhen Hua's argument. Instead, we hold simply that the arbitration clause contained in the charter party satisfies the requirements of arbitration exception to the FSIA.

## C. *Personal Jurisdiction*

Zhen Hua also moved the district court to dismiss for lack of personal jurisdiction. After noting that subject matter jurisdiction and personal jurisdiction over foreign sovereigns are nearly coextensive, the court determined that Zhen Hua's contractual negotiations with Titan satisfied constitutional due process requirements. *See Titan I,* 16 F.Supp.2d at 335–36. On appeal, Zhen Hua attacks the latter conclusion, arguing that (1) its contacts with the United States were not substantial, continuous and systematic, or purposeful in the sense required to satisfy due process concerns, and (2) the actions of Seagos cannot be imputed to Zhen Hua because Seagos served as a broker rather than an agent. We disagree.

■ The standard of review applicable to district court decisions regarding personal jurisdiction is clear error for factual findings and de novo for legal conclusions. *See Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1016 (2d Cir.1991).

■ In general, "subject matter jurisdiction plus service of process equals personal jurisdiction" under the FSIA. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981). Zhen Hua does not contend

that service of process was improper. However, the exercise of personal jurisdiction under the FSIA must also comport with the Due Process Clause, *see id.* at 313, which permits a forum to exercise personal jurisdiction over a non-resident defendant who has "certain minimum contacts [with the forum] ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice,'" *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940), and *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

 In invoking the "continuous and systematic" contacts test of *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), Zhen Hua fails to distinguish between "general personal jurisdiction" and "limited" or "specific" personal jurisdiction. General personal jurisdiction, which does require a finding of "continuous and systematic" contacts, is only necessary when the cause of action does not arise from the defendant's contacts with the forum state. *See Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1027–28 (2d Cir.1997). Where, as here, the claim arises out of, or relates to, the defendant's contacts with the forum, i.e., the negotiation of the charter party with an American corporation located in New York and the use of brokers in Connecticut,[12] the defendant need only prove "limited" or "specific" jurisdiction. *See id.* at 1028. In such a case, the required minimum contacts exist where the defendant "purposefully availed" itself of the privilege of doing business in the forum and could foresee

being "haled into court" there. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

In addition, a court must determine whether the assertion of personal jurisdiction "comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of a particular case." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996) (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154).

Whether it is "reasonable" to exercise jurisdiction in a particular case depends on "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."

*Chaiken,* 119 F.3d at 1028 (quoting *Metropolitan Life,* 84 F.3d at 568).

 Here, the record establishes that Zhen Hua "purposely availed itself" of the United States forum by negotiating and forming a contract with an American corporation located in New York. To facilitate the negotiations Zhen Hua utilized a broker located in Connecticut, which communicated with Titan personnel in New York via telex and/or facsimile to Titan's broker

---

12. In determining whether personal jurisdiction exists over a foreign defendant who, like Zhen Hua, has been served under a federal service of process provision, *see Titan I,* 16 F.Supp.2d at 335 (noting absence of "dispute that [Zhen Hua] was properly served pursuant to 28 U.S.C. § 1608), a court should consider the defendant's contacts throughout the United States and not just those contacts with

the forum." *See Chew v. Dietrich,* 143 F.3d 24, 27–28, 30 (2d Cir.1998) (holding in maritime action that German defendant's contacts with the United States were sufficient to establish personal jurisdiction); *Go–Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1414–15 (9th Cir.1989); *see also Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 293 (3d Cir.1985).

in Connecticut.[13] Having engaged in this commercial conduct,[14] Zhen Hua should have foreseen the possibility of being "haled into [an American] court" if a dispute were to arise out of the negotiations. Furthermore, Zhen Hua proffers no reason to believe that litigating in New York for the sole purpose of referring this matter to arbitration in London will impose or has imposed any undue hardship. Given the conduct of Zhen Hua, the nature and purpose of the litigation, and Titan's interest in obtaining an efficient referral to arbitration, the district court's exercise of personal jurisdiction was reasonable. Accordingly, the district court correctly concluded that it possessed personal jurisdiction over Zhen Hua.

## D. *Venue*

Finally, Zhen Hua moved the district court to dismiss the action for improper venue. The district court denied the motion, holding that the facsimile and telephone communications between Titan's offices in Pelham, New York and the brokers' offices in Connecticut constituted a substantial part of the events giving rise to the action. *See Titan I*, 16 F.Supp.2d at 336–37. On appeal, Zhen Hua argues that the court erred by relying on an inapplicable subsection of the venue statute and grounding its conclusion upon the fact that Titan and its broker sent communications between New York and Connecticut.

We have not previously decided whether we review a district court's determination of venue for abuse of discretion or de novo, but we need not resolve the issue here because the district court's decision would be entitled to affirmance under either standard.

Zhen Hua correctly argues that the apposite venue provision is 28 U.S.C. § 1391(f) (concerning civil actions against foreign states) rather than 28 U.S.C. § 1391(b) (concerning civil actions not founded solely on diversity of citizenship). The district court's mis-citation does not, however, vitiate its analysis. The language upon which the district court relied is common to both subsection (b) and subsection (f) of § 1391. *Compare* 28 U.S.C. § 1391(b)(2) ("A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought ... in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ....") *with id.* § 1391(f)(1) ("A civil action against a foreign state as defined in [the FSIA] may be brought ... in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred....").

■■■ As held by the district court, the charter party giving rise to Titan's claim and the purported "ad hoc" arbitration agreement giving rise to Zhen Hua's defense were negotiated between China and Pelham, New York via Connecticut. That many of Zhen Hua's communications reached Titan's offices in New York through the Connecticut brokers does not alter the fact that Zhen Hua directed communications to New York. Accordingly, venue in the Southern District of New York was proper. *Cf. Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 868 (2d Cir. 1992) ("We conclude that receipt [within the district] of a collection notice is a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act [to establish venue within that district pursuant to § 1391(b)(2)]."); *Sacody Techs., Inc. v. Avant, Inc.*, 862 F.Supp. 1152, 1157 (S.D.N.Y.1994) ("The standard

---

**13.** The record also reveals that Zhen Hua sent telex or facsimile communications directly to Titan concerning arbitration.

**14.** Whether Seagos served as Zhen Hua's agent for all purposes is immaterial. Zhen Hua engaged in commercial negotiations with Titan through Seagos, which served as Zhen Hua's agent for the exchange of communications.

set forth in § 1391(a)(2) [which employs the 'substantial part' language,] may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.").

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court. The parties should proceed to arbitration in London pursuant to the district court's August 5, 1998 opinion and order (as amended September 25, 1998) and September 29, 1998 opinion and order.